David A. Bricklin, WSBA 7583
bricklin@bnd-law.com
Alexander Sidles, WSBA 52832
sidles@bnd-law.com
Bricklin & Newman, LLP
1424 Fourth Avenue, Suite 500
Seattle, WA 98101
Telephone: (206) 264-8600
Attorneys for Plaintiffs

Hon. Richard A. Jones
Hon. Brian A Tsuchida

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
SEATTLE DIVISION

NORTH CASCADES
CONSERVATION COUNCIL; and
KATHY JOHNSON,

                               Plaintiffs,

        v.

UNITED STATES FOREST SERVICE,
et al.,

                               Defendants.

NO. 2:20-cv-01321-RAJ-BAT

PLAINTIFFS' MOTION FOR
SUMMARY JUDGMENT

NOTED FOR:  MARCH 22, 2021

**TABLE OF CONTENTS**

Page

I.      MOTION FOR SUMMARY JUDGMENT ....................................................................... 1

II.     STATEMENT OF FACTS ............................................................................................... 1

        A.      N3C and Kathy Johnson ..................................................................................... 1

        B.      The Project ........................................................................................................... 2

III.    LEGAL BACKGROUND ............................................................................................... 4

        A.      NFMA, the 1990 Plan and the 1994 Plan (Amended 2001) ................................... 4

Bricklin & Newman, LLP
Attorneys at Law
1424 Fourth Avenue, Suite 500
Seattle WA 98101
Tel.  (206) 264-8600
Fax. (206) 264-9300

B.   NEPA ................................................................................................. 5

IV.   ARGUMENT ................................................................................................. 5

A.   Standard of Review ....................................................................................... 5

B.   The Vegetation Project Violates the 1994 Plan Prohibition Against Increased Road Mileage ............................................................................... 7

1.   The 1994 Plan prohibits a net increase in road mileage............................ 7

2.   The Agency cannot demonstrate compliance with the "no net increase" rule because of multiple flaws in the pre- and post-Project road inventories ................................................................... 8

a.   The Forest Service overstates the pre-Project road mileage by erroneously counting decommissioned roads as existing roads......................... 8

b.   The Forest Service's pre-Project road inventory is riddled with inconsistencies ........................................... 11

c.   The Forest Service's post-Project inventory is riddled with inconsistencies ........................................... 12

d.   The Forest Service wrongly omits new temporary roads in its post-Project accounting  ............................ 15

C.   The Project Violates the 1990 Plan Requirement to Meet Forest Plan Requirements for Woodpecker Habitat ................................................ 18

D.   The Forest Service Failed to Determine Impacts on Sensitive Species and Failed to Survey for Species Subject to a "Survey and Manage" Mandate ......................................................................................................... 20

1.   The Forest Service failed to evaluate all sensitive species........................ 20

2.   The Forest Service failed to conduct pre-disturbance surveys for the Pacific Oregonian snail ................................................ 21

E.   The Forest Service Failed to Take a Hard Look at the Environmental Impacts of the Project.................................................................................. 23

F.   The Forest Service Failed to Analyze a Range of Reasonable Alternatives .................................................................................................. 24

**Bricklin & Newman, LLP**
Attorneys at Law
1424 Fourth Avenue, Suite 500
Seattle WA 98101
Tel. (206) 264-8600
Fax. (206) 264-9300

1
2

V.      CONCLUSION ................................................................................................ 24

3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

**Bricklin & Newman, LLP**
Attorneys at Law
1424 Fourth Avenue, Suite 500
Seattle WA 98101
Tel. (206) 264-8600
Fax. (206) 264-9300

**TABLE OF AUTHORITIES**

<u>Cases</u>                                                                                          <u>Page</u>

*Alliance for the Wild Rockies v. Bradford*, 856 F.3d 1238 (9th Cir. 2017) ................................. 17, 18

*Alliance for the Wild Rockies v. Savage*, 897 F.3d 1025 (9th Cir. 2018) ............................ 9, 11, 20

*Alliance for the Wild Rockies v. U.S. Forest Serv.*, 907 F.3d 1105 (9th Cir. 2018) ........................................................................................................................ 4, 5

*American Rivers v. Fed. Energy Regulatory Comm'n*, 201 F.3d 1186 (9th Cir. 1999) ...................................................................................................... 23

*Audubon Soc'y of Portland v. U.S. Army Corps of Eng'rs*, 3:15-cv-665-SI, 2016 WL 4577009 (D. Or. Aug. 31, 2016) ........................................................................ 6

*Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208 (9th Cir. 1998) ............................................................................................................ 23

*Cal. Wilderness Coalition v. U.S. Dep't of Energy*, 631 F.3d 1072 (9th Cir. 2011) ............................................................................................................... 5

*Coeur Alaska v. Bonneville Power Admin.*, 557 U.S. 261 (2009) ................................................ 6

*Earth Island Inst. v. U.S. Forest Serv.*, 442 F.3d 1147 (9th Cir. 2006), *abrogated on other grounds by Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 129 S. Ct. 365, 172 L. Ed. 2d 249 (2008) ................................................ 21, 22

*Friends of Bitterroot v. Marten*, CV-20-19-M-DLC, 2020 WL 5804251 (D. Mont., Sept. 29, 2020) .................................................................................................. 10

*Hapner v. Tidwell*, 621 F.3d 1239 (9th Cir. 2010) .................................................................. 6

*Klamath Siskiyou Wildlands Ctr. v. Boody*, 468 F.3d 549 (9th Cir. 2006) .................................... 5

*Klamath-Siskiyou Wildlands Ctr. v. Graham*, 899 F.Supp.2d 948 (E.D. Cal., 2012) .................................................................................................................... 17

*Lands Council v. Powell*, 395 F.3d 1019 (9th Cir. 2005) ........................................................ 23

*Marsh v. Oregon Natural Res. Council*, 490 U.S. 360 (1989) ..................................................... 5

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983) ............................................................................................................... 6

**Bricklin & Newman, LLP**
Attorneys at Law
1424 Fourth Avenue, Suite 500
Seattle WA 98101
Tel. (206) 264-8600
Fax. (206) 264-9300

*Native Ecosystem Council v. Krueger*, 946 F.Supp.2d 1060 (D. Mont., 2013).................................................................................................................17

*Native Ecosystems Council v. Martin*, 209 F.Supp.3d 1168 (D. Mont. 2016).................................................................................................................17

*Native Ecosystem Council v. U.S. Forest Serv.*, 418 F.3d 953 (9th Cir. 2005).........................................................................................................6

*Native Ecosystem Council v. U.S. Forest Serv.*, 428 F.3d 1233 (9th Cir. 2005)................................................................................................23, 24

*Native Ecosystems Council v. Weldon,* 697 F.3d 1043 (9th Cir. 2012)................4

*Neighbors of Cuddy Mountain v. U.S. Forest Serv.*, 137 F.3d 1372 (9th Cir. 1998).................................................................................................................6

*SE. Ala. Conservation Council v. U.S. Army Corps of Eng'rs*, 486 F.3d 638 (9th Cir. 2007) ...................................................................................................6

Statutes and Regulations                                                                    Page

36 C.F.R. § 212.1..............................................................................................9

36 C.F.R. Part 218.............................................................................................2

36 C.F.R. § 220.7.............................................................................................24

40 C.F.R. § 1501.3.............................................................................................5

40 C.F.R. § 1501.6.............................................................................................5

5 U.S.C. § 706.........................................................................................1, 11, 21

5 U.S.C. § 706(2)(A).............................................................................5, 15, 18, 19

5 U.S.C. § 706(2)(C)...........................................................................................5

5 U.S.C. § 706(2)(D)...........................................................................................5

5 U.S.C. 706(2)(E)............................................................................................15

16 U.S.C. § 1600................................................................................................1

**Bricklin & Newman, LLP**
Attorneys at Law
1424 Fourth Avenue, Suite 500
Seattle WA 98101
Tel. (206) 264-8600
Fax. (206) 264-9300

16 U.S.C. § 1600-1687 .................................................................................................. 4

16 U.S.C. § 1604 ........................................................................................................... 4

16 U.S.C. § 1604(i) .................................................................................................. 4, 19

42 U.S.C. § 4321 ........................................................................................................... 1

42 U.S.C. § 4332(E) .................................................................................................... 24

<u>Other Authorities</u>                                                                                                     <u>Page</u>

"Enforcing Ecosystem Management under the Northwest Forest Plan: the
Judicial Role," 12 Fordham Entl. L.J. 211 (2000) ........................................................ 4

**Bricklin & Newman, LLP**
Attorneys at Law
1424 Fourth Avenue, Suite 500
Seattle WA 98101
Tel. (206) 264-8600
Fax. (206) 264-9300

# I.    MOTION FOR SUMMARY JUDGMENT

Plaintiffs North Cascades Conservation Council ("N3C") and Kathy Johnson move the court for summary judgment on claims for relief associated with the National Forest Management Act (NFMA), 16 U.S.C. § 1600, *et seq*, and the National Environmental Policy Act (NEPA), 42 U.S.C. § 4321, *et seq*. Plaintiffs seek vacatur of the Record of Decision and Final Environmental Analysis for the South Fork Stillaguamish Vegetation Project (the "Project").

While dubbed a "vegetation" project by the Forest Service, the Project calls for the construction of miles of roads and the harvest of timber on approximately 3,000 – 4,300 acres.   The Forest Service's District Ranger for the Darrington District of the Mount Baker-Snoqualmie National Forest approved the Project even though it is inconsistent with the 1990 Mount-Baker Snoqualmie National Forest Plan ("1990 Plan") and the 1994 Northwest Forest Plan ("1994 Plan"). The agency also failed to adequately analyze environmental issues before making its decision, contrary to NEPA's requirements. The Forest Service's actions were arbitrary and capricious, not in accordance with law, and taken without observance of procedure. This Court should hold unlawful and vacate the Record of Decision and Final Environmental Analysis under the Administrative Procedures Act (APA), 5 U.S.C. § 706, and enjoin the Forest Service from allowing any implementing land-disturbing activities.

# II.    STATEMENT OF FACTS

## A.    N3C and Kathy Johnson

N3C is a non-profit environmental organization established in 1957. Its current board of directors and 400 members remain dedicated to protecting the North Cascades ecosystems for its inherent natural values and for the scientific and recreational opportunities it provides to N3C members and the public at large. In support of this mission, N3C regularly scrutinizes proposed timber sales in the North Cascades and selectively opposes those that threaten unreasonable environmental

**Bricklin & Newman, LLP**
Attorneys at Law
1424 Fourth Avenue, Suite 500
Seattle WA 98101
Tel. (206) 264-8600
Fax. (206) 264-9300

harm. N3C submitted a formal objection to the Project in accordance with the administrative exhaustion requirements of 36 C.F.R. Part 218. *See* N3C Objection, Dkt. 7-40, AR 19575–19602 (Nov. 7, 2017). On several occasions in December 2017, N3C participated in meetings with the Forest Service to resolve its objections to the Project. *See* Objection Meeting Notes, Dkt. 7-40, AR 19603–19604 (Dec. 15, 2017); AR 19605–19607, (Dec. 17, 2017); AR 19608–19614 (Dec. 19, 2017).

Kathy Johnson is a member of N3C. For over three decades, she has spent substantial time in the South Fork Stillaguamish area, where she hikes, birdwatches, gathers mushrooms, berries and medicinal plants, and enjoys the serenity and beauty of the forest. She intends to continue those activities into the future. She submitted comments about the Project on behalf of Pilchuck Audubon Society and N3C. *See, e.g.*, Dkt. 7-40, AR 19576; AR 19603–19604.

Vacatur of the Record of Decision and Final Environmental Analysis and enjoining related implementing actions will protect N3C and Ms. Johnson's interests in the Project area, in that the Forest Service would be compelled to abandon its plan to harvest timber and build roads that degrade the quality of the environment or, at least, fully evaluate the environmental impacts of the harvest and roads prior to making a new decision about whether to proceed.

**B.      The Project**

The Project area consists of 65,000 acres within the larger Mount Baker-Snoqualmie National Forest in Washington's Cascade Mountains. *See* Final Environment Assessment ("FEA"), Dkt. 7-39, AR 19095-19425, at AR 19101; map at AR 19102. The Project area consists of a mosaic of natural stands (meaning patches of old-growth trees that have never been logged) and "managed" stands (meaning patches that were logged in previous decades and are now regrowing). *Id.*

PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT - 2
NO. 2:20-CV-01321-RAJ-BAT

Bricklin & Newman, LLP
Attorneys at Law
1424 Fourth Avenue, Suite 500
Seattle WA 98101
Tel.  (206) 264-8600
Fax. (206) 264-9300

The Project proposes to construct new roads and log on approximately 3,000 – 4,300 acres. *See* Decision, Dkt. 7-43, AR 20268–20318, at AR 20268. The proposed logging will not consist of clearcuts but rather "thinning." *Id*.

Thinning is a process in which many trees, but not all, are removed from a particular stand. FEA, Dkt. 7-39, AR 19123–19126. The purpose of thinning is to eliminate smaller trees from the stand, thereby concentrating the stand's growth potential in the remaining, larger trees, which will grow faster in the absence of competition. *Id*. In commercial thinning, the felled logs are hauled away and sold. In non-commercial thinning, the felled logs remain in place. *Id*.

Within the 65,000-acre Project area, 2,000 – 3,300 acres will be commercially thinned. An additional 1,060 acres will be "considered" for non-commercial thinning. Decision, Dkt. 7-43, AR 20268. Because non-commercial thinning does not generate revenue but does generate cost, the ultimate decision on how much land to subject to non-commercial thinning will depend on revenues from the commercial thinning and on other funding sources. FEA, Dkt. 7-39, AR 19123.

The extraction of logs from the commercially thinned areas will require the construction of new "haul roads" to move the logs out of the forest. Decision, Dkt. 7-43, AR 20290. By contrast, the non-commercially thinned areas will not require the construction of roads. *See* FEA, Dkt. 7-39, AR 19132 (map showing proposed "temporary roads" in yellow, all of which lead to commercially thinned areas but not non-commercially thinned areas). The exact mileage of roads to be constructed is a disputed issue in this case, so it will be addressed in the argument section of this brief.

In September 2017, the Forest Service completed its FEA for the Project. FEA, Dkt. 7-39, AR 19095-19425. On May 31, 2019, the Forest Service issued its finding of no significant environmental impact, which means there would be no comprehensive environmental analysis in the form of an environmental impact statement. Simultaneously, the agency selected Alternative 2B as its final

**Bricklin & Newman, LLP**
Attorneys at Law
1424 Fourth Avenue, Suite 500
Seattle WA 98101
Tel. (206) 264-8600
Fax. (206) 264-9300

action. Decision, Dkt. 7-43, AR 20268–20318. On or about the same date, the Forest Service also issued an errata sheet for the FEA. Errata, Dkt. 7-43, AR 20260–20267.

## III.    LEGAL BACKGROUND

### A.    NFMA, the 1990 Plan and the 1994 Plan (Amended 2001)

The National Forest Management Act (NFMA), 16 U.S.C. §§ 1600-1687, charges the Forest Service with the management of national forest land, including planning for the protection and use of the land and its natural resources. *Alliance for the Wild Rockies v. U.S. Forest Serv.*, 907 F.3d 1105, 1109 (9th Cir. 2018). Under NFMA, forest land management occurs on two levels: (1) the forest level, and (2) the individual project level. *Id*. at 1109 (citing *Native Ecosystems Council v. Weldon*, 697 F.3d 1043, 1056 (9th Cir. 2012)).

On the forest level, each planning unit of the National Forest system is managed under a "Land Resource Management Plan," commonly called a "forest plan." 16 U.S.C. § 1604. A forest plan describes the desired resource conditions across the planning unit and provides allocations, goals, objectives, standards, and guidelines for forest managers. *Id*. Specific logging projects, such as the Vegetation Project, must be consistent with the goals, objectives, standards, and guidelines set forth in the forest plan. 16 U.S.C. § 1604(i).

The Project is subject to the governance of two forest plans: the 1990 Plan for the Mt. Baker-Snoqualmie National Forest and the 1994 Northwest Forest Plan that emerged from the spotted owl litigation of the 1980s and 90s. Decision, Dkt. 7-43, at AR 20276.[1] The 1994 Plan was updated with new "survey and manage" guidelines for wildlife in 2001. *Id*. at AR 20273. The specific requirements of these plans and the Vegetation Project's non-compliance with them will be discussed below.

---

[1] For background on the emergence of the 1994 Northwest Forest Plan, *see* "Enforcing Ecosystem Management under the Northwest Forest Plan: the Judicial Role," 12 Fordham Entl. L.J. 211 (2000).

Bricklin & Newman, LLP
Attorneys at Law
1424 Fourth Avenue, Suite 500
Seattle WA 98101
Tel. (206) 264-8600
Fax. (206) 264-9300

**B.** **NEPA**

NEPA compels agencies to prepare an environmental assessment (EA) when the agency proposes action that might result in adverse environmental impacts. 40 C.F.R. § 1501.3. Based on the assessment, the agency then issues either a Finding of No Significant Impact (FONSI) or an EIS. The agency prepares an EIS when "substantial questions are raised as to whether a project may cause significant degradation of some human environmental factor." *Cal. Wilderness Coalition v. U.S. Dep't of Energy*, 631 F.3d 1072, 1097 (9th Cir.2011) (citations omitted). If the agency determines that there are no substantial questions, then it may issue a FONSI. 40 C.F.R. § 1501.6.

## IV.   ARGUMENT

### A.   Standard of Review

Judicial review of final agency decisions under NEPA and NFMA is governed by the Administrative Procedures Act ("APA"). *Alliance for the Wild Rockies v. U.S. Forest Serv.*, 907 F.3d 1105, 1112 (9th Cir. 2018). Under the APA, the court shall set aside an agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," "short of statutory right," or found to be "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (C), (D); *Klamath Siskiyou Wildlands Ctr. v. Boody*, 468 F.3d 549, 554 (9th Cir. 2006).

Judicial review under this standard is to be "searching" and "careful" and should determine whether the decision was based upon a consideration of the relevant factors. *Marsh v. Oregon Natural Res. Council*, 490 U.S. 360, 378 (1989). An agency action should be overturned when the agency has "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or

**Bricklin & Newman, LLP**
Attorneys at Law
1424 Fourth Avenue, Suite 500
Seattle WA 98101
Tel. (206) 264-8600
Fax. (206) 264-9300

the product of agency expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

Courts have effectively treated forest plan directives as equivalent to federal regulations adopted under the APA, deferring to the Forest Service's interpretation of plan directives that are susceptible to more than one meaning, unless the interpretation is plainly erroneous or inconsistent with the directive. *See Hapner v. Tidwell*, 621 F.3d 1239, 1251 (9th Cir. 2010). An agency's position that is contrary to the clear language of a forest plan is not entitled to deference. *Native Ecosystem Council v. U.S. Forest Serv.*, 418 F.3d 953, 962 (9th Cir. 2005); *Neighbors of Cuddy Mountain v. U.S. Forest Serv.*, 137 F.3d 1372, 1377 (9th Cir. 1998).

Vacatur of an unlawful decision is appropriate under Section 706 of the APA, *See, e.g., SE. Ala. Conservation Council v. U.S. Army Corps of Eng'rs*, 486 F.3d 638, 654 (9th Cir. 2007) ("Under the APA, the normal remedy for an unlawful agency action is to 'set aside' the action."), *rev'd on other grounds sub nom. Coeur Alaska v. Bonneville Power Admin.*, 557 U.S. 261 (2009); *Audubon Soc'y of Portland v. U.S. Army Corps of Eng'rs*, 3:15-cv-665-SI, 2016 WL 4577009 *12 (D. Or. Aug. 31, 2016) ("[w]hen a court determines that an agency's decision was unlawful under the APA, vacatur is the typical remedy").

As argued below, the Forest Service's actions in approving the Project are contrary to the clear language of the 1990 Plan and 1994 Plan, so the Forest Service is not entitled to deference. In addition, its environmental review of the Project failed to consider important aspects of the problem, including those articulated in the 1990 Plan and 1994 Plan.

**Bricklin & Newman, LLP**
Attorneys at Law
1424 Fourth Avenue, Suite 500
Seattle WA 98101
Tel. (206) 264-8600
Fax. (206) 264-9300

**B.      The Vegetation Project Violates the 1994 Plan Prohibition Against Increased Road Mileage**

In recognition of the environmental damage caused by roads, the 1994 Plan seeks to reduce total road mileage in the forest and absolutely precludes any increase. In several respects, the Project violates the prohibition against any increase. Errors exist on both sides of the equation: The mileage of pre-Project roads is overstated, and the mileage of post-Project roads is understated. Both calculations also suffer from accountings that are at times inconsistent and/or impossible to decipher. We discuss these issues below.

**1.      The 1994 Plan prohibits a net increase in road mileage**

The 1994 Plan recognizes that logging roads often cause more harm fish-bearing streams than any other activity, even worse than the logging itself:

> Road networks in many upland areas of the Pacific Northwest are the primary sources of management-accelerated sediment delivery to anadromous fish habitat. Sedimentation from this source is often **much greater than from all other land management activities combined**, including log skidding and yarding. Large storms can result in road-related landslides, surface erosion and stream channel diversion. Storms deliver large quantities of sediment to streams, both chronically and catastrophically. **Roads have unavoidable effects on streams no matter how well they are designed, located or maintained**.

Final Supplemental EIS to the 1994 Plan, Dkt. 7-11, at AR 04470 (emphasis added). Thus, the 1994 Plan includes Standards and Guidelines C-7, which seeks to reduce total road miles and in "Key Watersheds" absolutely prohibits an increase:

> Outside Roadless Areas - Reduce existing system and nonsystem road mileage. If funding is insufficient to implement reductions, **there will be no net increase in the amount of roads in Key Watersheds**.

**Bricklin & Newman, LLP**
Attorneys at Law
1424 Fourth Avenue, Suite 500
Seattle WA 98101
Tel. (206) 264-8600
Fax. (206) 264-9300

1994 Plan, Dkt. 7-13, AR 06351–06586, at 06490 (emphasis supplied). ("Key Watersheds" contain "at-risk anadromous salmonids, bull trout, and resident fish species, or are important sources of high quality water." EIS to the 1994 Plan, Dkt. 7-11, at AR 04357.)

The Forest Service acknowledges that the entire Project is within a Key Watershed. FEA, Dkt. 7-39, at AR 19114. Therefore, Standard C-7 applies: The Forest Service must reduce existing road mileage and, if there is insufficient funding to do so, the Forest Service must, at a minimum, prevent a net increase in amount of roads in the Project area.

> **2.     The Agency cannot demonstrate compliance with the "no net increase" rule because of multiple flaws in its pre- and post-Project road inventories**

In its description of existing and proposed roads, the Forest Service plays a complex shell game to conceal the existing and proposed mileage—so complex, in fact, that the Forest Service confused itself and had to issue an errata to the FEA correcting its mileage figures. Decision, Dkt. 70-43, AR 20270;[2] Errata, Dkt. 7-43, AR 20266–20267 (amending FEA, Dkt. 39, at AR 19143 and 19316). However, even with the errata, the Forest Service's figures do not add up to no net increase either with regard to the pre-project or post-project road mileage calculations.

> **a.     The Forest Service overstates the pre-Project road mileage by erroneously counting decommissioned roads as existing roads**

It is impossible to determine whether the total mileage of roads after a project is complete is greater or less than the pre-project baseline unless the agency accurately and clearly determines the pre-project road mileage. Unsurprisingly, then, the Ninth Circuit has ruled that if the Forest Service fails to indicate which roads are included in its "baseline" inventory of roads, the Service cannot demonstrate compliance with forest plan requirements to avoid increasing the mileage of roads. *See*

---

[2] "Note: these are the same ML [maintenance level] determinations analyzed for this alternative in the EA but the summary information for total miles has been corrected in this decision and will be noted in errata to the EA."

**Bricklin & Newman, LLP**
Attorneys at Law
1424 Fourth Avenue, Suite 500
Seattle WA 98101
Tel. (206) 264-8600
Fax. (206) 264-9300

*Alliance for the Wild Rockies v. Savage*, 897 F.3d 1025, 1036 (9th Cir. 2018) ("The Forest Service committed clear error in its analysis by failing to specify that the existing undetermined roads were included in the Access Amendments baseline calculation, and thus failed to provide a cogent explanation for its conclusion that the Project complies with the Access Amendments").

The Forest Service categorizes roads by their maintenance levels, which the FEA and Decision abbreviate "ML." The ML of a road describes the standard to which the road is currently managed. FEA, Dkt. 7-39, AR 19298. ML1 roads are the lowest standard, characterized as "[i]ntermittent service roads managed as closed to vehicular traffic, and kept in storage until the next project access need." *Id*. At the other end of the spectrum, ML5 roads provide the highest standard of comfort and convenience, "normally double lane and paved." *Id*. ML2, ML3, and ML4 fall in-between. *Id*.

Two categories of roads fall outside the ML system. One is the "Unclassified" roads (formerly "primitive roads") which receive no maintenance. They are "not managed as part of the forest transportation system, including those roads that were once under permit or other authorization and were not decommissioned upon the termination of the authorization." *Id*.

The other non-ML category is decommissioned roads. Decommissioned roads are no longer roads at all. They are closed with berms and vegetation is allowed to grow, rendering them impassable to vehicles. *Id*. at AR 19279. The intention with a decommissioned road is that "soil and plant growth would eventually reclaim the road site." *Id*. at AR 19242. *See also* 36 C.F.R. § 212.1 ("Road Decommissioning. Activities that result in the stabilization and restoration of unneeded roads to a more natural state").

Decommissioned roads are similar to unclassified roads in that neither receive maintenance, but different in that decommissioned roads are "managed according to the land allocation in which [they are] located" (FEA, Dkt. 7-39, AR 19380), meaning the road corridor of a decommissioned road

**Bricklin & Newman, LLP**
Attorneys at Law
1424 Fourth Avenue, Suite 500
Seattle WA 98101
Tel. (206) 264-8600
Fax. (206) 264-9300

is treated the same as the surrounding forest type for purpose of forest management. For instance, if a decommissioned road is traversing forest lands designated for harvest, the acreage beneath that decommissioned roads is characterized as part of the harvest area, not as a "road." *See Friends of Bitterroot v. Marten*, CV-20-19-M-DLC, 2020 WL 5804251 (D. Mont., Sept. 29, 2020) (decommissioned roads are "returned to the productive land base").

By contrast, unclassified roads are obsolete roads that were *not* decommissioned. *Compare* FEA, AR 19380 (FEA definition of decommissioned road) with AR 19392 (FEA definition of unclassified road). The acreage beneath "unclassified" roads is still denominated as "road," unlike that of decommissioned roads.

The Forest Service details the existing road inventory in the Project area in Table 33 of the FEA. The table commingles the mileage of unclassified and decommissioned roads, despite their very different status for land management purposes:

| Maintenance Level (ML) | ML Type | Miles |
|---|---|---|
| 5 | High degree of user comfort and convenience | 0 |
| 4 | Moderate degree of user comfort and convenience at moderate travel speeds | 5.3 |
| 3 | Maintained for travel by prudent driver in standard passenger car | 71 |
| 2 | High clearance vehicle use | 27.1 |
| 1 | Intermittent use road while placed in storage | 71.5 |
| Unclassified | Unclassified or decommissioned | 23 |
| Total | | 197.9 |

FEA, Dkt. 7-39, Table 33, AR 19299.

Because decommissioned roads are supposed to be managed the same as the surrounding forest, not treated as roads, the decommissioned roads should have been excluded from the inventory of existing roads. By including the mileage of the decommissioned roads in the inventory of existing roads, the Forest Service makes it appear as if there is currently more mileage in the Project area than

Bricklin & Newman, LLP
Attorneys at Law
1424 Fourth Avenue, Suite 500
Seattle WA 98101
Tel. (206) 264-8600
Fax. (206) 264-9300

actually exists—an error which helps the Forest Service conceal the Project's increase in actual road mileage. Because the agency's net road mileage calculation is built on this flawed pre-project inventory, the net mileage calculation is inherently flawed. Therefore, the decision should be vacated. *See Alliance for the Wild Rockies v. Savage*, 897 F.3d at 1036.

     **b.**  **The Forest Service's pre-Project road inventory is riddled with inconsistencies**

   Separately from the road mileage table discussed in the prior section, the Forest Service made an effort to disaggregate the decommissioned roads from the unclassified roads, but that attempt only highlights the Forest Service's failure to accurately inventory the roads.  In its record of decision, the Forest Service claims it will reopen 29 miles of "closed roads" on a temporary basis. Decision, Dkt. 7-43, at AR 20269. It describes these existing, closed roads as "12 miles of non-system roads" (meaning unclassified roads, per FEA, Dkt. 7-39, AR 19303) and "15 miles of road prism from previous timber harvest" (meaning decommissioned roads, per FEA, Dkt. 7-39, AR 19157). Decision, Dkt. 7-43, AR 20269.

   However, 12 + 15 = 27 miles, not 29 miles (the miles of closed roads the Decision says will be re-opened), so these numbers literally do not add up. Nor are these numbers consistent with the value in Table 3 of the FEA (Dkt. 7-39, AR 19299), which listed 23 miles of "unclassified or decommissioned roads" in the Project area, not 27 miles nor 29 miles. In its various attempts to explain the existing road mileage calculations, the Forest Service simply cannot get its facts straight.

   Clearly, the Forest Service is counting some previously decommissioned roads as existing roads in its inventory of existing roads. But the exact mileage affected cannot be determined because the Forest Service does not provide consistent accounting. Without that data, the agency lacks a

Bricklin & Newman, LLP
Attorneys at Law
1424 Fourth Avenue, Suite 500
Seattle WA 98101
Tel. (206) 264-8600
Fax. (206) 264-9300

"cogent" legitimate foundation for its net road mileage calculation, rendering its decision arbitrary and capricious and unsupported by substantial evidence. 5 U.S.C. § 706.

### c.   The Forest Service's post-Project inventory is riddled with inconsistences

The Forest Service's post-Project road mileage forecasts are also internally inconsistent. As with the pre-Project inventories, the agency's numbers simply do not add up.  We describe two significant inconsistencies in this section.

The FEA's Table 44 sets forth the agency's pre- and post-Project mileages and purports to show that they are the same. The table is reproduced below. The column "Existing – No Action Miles" tallies the pre-Project miles.  The column "Alt. 2B mileage" tallies the post-Project miles. The totals in both columns (197 miles) purport to show that there is no change in net road mileage.[3]

| Maintenance Level (ML) | ML Type | Existing - No Action Miles | Alt. 2B mileage |
|---|---|---|---|
| 4 | Moderate degree of user comfort and convenience at moderate travel speeds | 5.26 | 5.26 |
| 3 | Maintained for travel by prudent driver in standard passenger car | 71 | 53 |
| 2 | High clearance vehicle use | 27.1 | 20 |
| 2A | Administrative use only | 0 | 8 |
| 1 | Intermittent use road while placed in storage | 71.55 | 70 |
| C | Convert system road to trail | 0 | 1.8 |
| 0 | Decommission current system road | 0 | 17 |
| Unclassified | Unclassified road used as temporary roads would be decommissioned | 22 | 22 |
| Total | | 197 | 197 |

FEA, Dkt. 7-39, Table 44, AR 19313.

---

[3] As noted in the prior section of this brief, the FEA inventory of 197.9 miles of existing roads, AR 19299, is inaccurate because it counts decommissioned roads as existing roads. But for argument sake, we use that as the baseline in this section.

PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT - 12
NO. 2:20-CV-01321-RAJ-BAT

Bricklin & Newman, LLP
Attorneys at Law
1424 Fourth Avenue, Suite 500
Seattle WA 98101
Tel. (206) 264-8600
Fax. (206) 264-9300

First, there is a new and unexplained inconsistency between Table 33 (AR 19299) and Table 44 (AR 19313) with regard to the "unclassified" roads. In Table 33, the existing roads in the "unclassified" category include an undifferentiated mixture of unclassified roads and decommissioned roads. (These two categories should have been disaggregated, as described above, but at least Table 33 acknowledges the existence of both unclassified and decommissioned roads.) In Table 44, however, the "unclassified" ML term (in column one) disappears, replaced by the "ML0" descriptor and this line of the table now references only unclassified roads, as if there were no decommissioned roads. This is a whole new failure to account for the Project's mileage, in that the FEA indicates there are both unclassified and decommissioned roads, not just unclassified roads, as Table 44 claims.

A second, smaller discrepancy between Table 33 and Table 44 is the change from 23 unclassified miles in Table 33 to 22 unclassified miles in Table 44. This change is made without explanation, creating yet another inconsistent tally of the Forest Service's roads. As the 1994 Plan notes, "each mile" of roads is significant for purposes of the no-net increase rule. Dkt. 7-13, at AR 06469. No-net increase requires a one-mile reduction for a one-mile increase. A single mile cannot simply be added or deleted at whim, as has occurred here.

A third, larger inconsistency flows from the agency's effort to fix the problems with the errata. But the errata creates new inconsistencies of its own. The errata sheet does not include a replacement to Table 44, but juxtaposing the values from Table 44 with those included in the errata results in the following comparison:

Bricklin & Newman, LLP
Attorneys at Law
1424 Fourth Avenue, Suite 500
Seattle WA 98101
Tel. (206) 264-8600
Fax. (206) 264-9300

| Maintenance Level (ML) | ML Type | Existing - No Action Miles (same on both tables) | Original Table 44 Alt. 2B mileage | Errata Table 44 Alt. 2B mileage |
|---|---|---|---|---|
| 4 | Moderate degree of user comfort and convenience at moderate travel speeds | 5.26 | 5.26 | 5.26 |
| 3 | Maintained for travel by prudent driver in standard passenger car | 71 | 53 | 41 |
| 2 | High clearance vehicle use | 27.1 | 20 | 14 |
| 2A | Administrative Use Only | 0 | 8 | 8 |
| 1 | Intermittent use road while placed in storage | 71.55 | 70 | 60 |
| C | Convert system road to trail | 0 | 1.8 | 1.8 |
| 0 | Decommission current system road | 0 | 17 | 17 |
| Unclassified | Unclassified road used as temporary roads would be decommissioned | 22 | 22 | 23 |
| Total | | 197 | 197 | 170 |

The errata makes it appear as if there has been a bottom-line 27-mile reduction in road mileage relative to both existing conditions and the original Table 44 (197 miles drops to 170). But this reduction does not withstand scrutiny. The 27 mile drop in post-Project mileage between Table 44 and the errata is the sum of a 12 mile reduction in post-Project in ML3, a 6 mile reduction in ML 2, and a 10 mile reduction in ML 1. (As noted earlier, there was also a one mile change in the opposite direction in "Unclassified.") The errata's accounting is silent as to the disposition of these roads.  If, for instance, the Project results in 12 fewer miles of ML3 roads, where have they gone?  According to the errata, they have simply disappeared. They are not accounted for in any other category. If they are to be decommissioned, there should be a corresponding increase in that category, but there is none.  The errata shows a total of only 17 miles of decommissioned road, which is the same as the total mileage of decommissioned roads in Table 44. Twenty-seven miles of existing road have disappeared without accounting for them anywhere.

Simply put, nothing the Forest Service says about its road mileage is believable: Neither the existing road mileage (where decommissioned roads are wrongly counted as unclassified roads) nor

Bricklin & Newman, LLP
Attorneys at Law
1424 Fourth Avenue, Suite 500
Seattle WA 98101
Tel. (206) 264-8600
Fax. (206) 264-9300

the Project mileage (where the Forest Service deletes 27 miles from its inventory without actually decommissioning them) withstand scrutiny. The Project should be vacated because of the Forest Service's failure to demonstrate compliance with the 1994 Plan's Standard C-7, even when it comes to such a simple task as tallying road mileage in a consistent manner. 5 U.S.C. 706(2)(A), (E).

> ### d.   The Forest Service wrongly omits new temporary roads in its post-project accounting

The Forest Service fails to include "temporary" roads in its post-Project inventory—it does not count them at all, as if the temporary roads will never exist. Like the other errors, this flaw precludes the agency from demonstrating compliance with the no net increase standard.

The Forest Service will be opening either 23 miles or 29 miles of so-called temporary roads. *See* Errata, Dkt. 7-43, AR 20267 ("Use and then decommission approximately 23 miles of non-system roads"); Decision, Dkt. 7-43, AR 20269 ("reopening 29 miles of closed roads and closing after use"). Consistent with its sloppy bookkeeping, the Forest Service provides no explanation for these conflicting values: 23 or 29 miles. Whatever the correct value, the agency has failed to account for these roads in its inventory. Yet these 23 or 29 miles of roads would function as roads for the duration of the Project, so they should have counted against the no-net increase requirement.

The agency's use of the adjective "temporary" to describe these roads is misleading. "Temporary" might suggest roads in existence for a brief time.  But nothing in the record provides a deadline by which the timber contractors will have to decommission the temporary roads. On the contrary, as the Forest Service itself states:

> 2.2.2.5 Timing of Project Activities
>
> Most activities would be completed within the next **10 to 15 years**. Some actions related to timber sale preparation could begin at the earliest possible implementation date. Other actions, such as road to trail conversion or recreation site improvements would not begin **until**

**Bricklin & Newman, LLP**
Attorneys at Law
1424 Fourth Avenue, Suite 500
Seattle WA 98101
Tel. (206) 264-8600
Fax. (206) 264-9300

1

2

3

4

5

> **after thinning is completed and funding is secured from grants or
> other sources to complete construction**. Connected actions may
> require sequencing over the **10 or more** years with the commercial
> thinning activities which would occur over the course of several years.
> Road and trailhead construction activities, **road decommissioning** and
> aquatic organism passage activities, etc. **would also occur
> intermittently, as funding becomes available** through timber sales or
> other sources.

6

Dkt. 7-39, FEA, AR 19138 (emphasis added).

7

8

9

> Road work and harvest activity associated with timber sales in the
> project could begin in 2018 and continue **for approximately 10 years
> through successive timber sale contracts**.

10

*Id*. at AR 19182 (emphasis added).

11

12

> The purpose of the project is to manage the SF Stillaguamish Late
> Successional Reserve on a landscape scale with opportunities for forest
> management actions identified for the next **10 to 20 years**.

13

*Id*, at AR 19109 (emphasis added).

14

15

16

17

18

Ten to 20 years of additional "temporary" road mileage, while the timber contracts remain active, the roads remain in use, and the Forest Service looks for decommissioning funding that may never appear, is not consistent with the requirement of the 1994 Plan, Standard C-7 that there be "no net increase in the amount of roads."

19

20

21

22

23

24

25

Leaving the so-called temporary roads in place for 10–20 years will result in multiple decades of "landslides, surface erosion and . . . large quantities of sediment to streams." Dkt. 7-11, at AR 04470 (1994 Plan FEIS). Contrary to the Plan's mandate for no net road mileage increase, these new miles of road will not be offset during this time by decommissioning elsewhere.  The temporary roads are omitted from the agency's supposedly balanced road budget.  The only way to offset the impacts of the 10–20 years of new "temporary" roads and thereby achieve no net increase would be to

26

Bricklin & Newman, LLP
Attorneys at Law
1424 Fourth Avenue, Suite 500
Seattle WA 98101
Tel. (206) 264-8600
Fax. (206) 264-9300

decommission other roads before or concurrently with opening the new "temporary" roads. But the Forest Service has not proposed such a plan.

In *Native Ecosystem Council v. Krueger*, 946 F.Supp.2d 1060, 1088–1088 (D. Mont., 2013), the court found that when a forest plan's EIS recognized impacts from temporary roads and recommended "no net increase" in road mileage, a revision to the forest plan that discounted temporary road mileage from the forest's final mileage was arbitrary and capricious. The parallel to this case is obvious, in that the 1994 Plan EIS recognizes severe landslide and erosion impacts from roads "no matter how well they are designed, located or maintained." Dkt. 7-11, at AR 04470. If it was arbitrary and capricious to discount temporary miles in *Krueger*, it is arbitrary and capricious to discount them here.

Federal courts have, on occasion, countenanced projects that created temporary increases in road miles during the projects, even where forest plans called for "no net increase." However, none of these projects proposed decades-long temporary roads and all of these projects resulted in *fewer* roads at the end of the project, neither of which is the case for this Project. For instance, in *Klamath-Siskiyou Wildlands Ctr. v. Graham*, 899 F.Supp.2d 948, 966 (E.D. Cal., 2012), the court upheld a project that added 6.7 miles of new road, but also proposed decommissioning 15 miles of existing road "in the near future." In *Native Ecosystems Council v. Martin*, 209 F.Supp.3d 1168, 1172 (D. Mont. 2016), the court upheld a project that authorized 11.2 of additional temporary roads, but the decommissioning of 22 miles of roads. Neither of these cases indicates support for this Project, which does not propose any decrease in road mileage at the end of the Project and will increase "temporary" roads for decades— not the "near future."

In *Alliance for the Wild Rockies v. Bradford*, 856 F.3d 1238, 1242 (9th Cir. 2017), the 9th Circuit upheld a project that called for a temporary increase in road miles during the project, but there,

Bricklin & Newman, LLP
Attorneys at Law
1424 Fourth Avenue, Suite 500
Seattle WA 98101
Tel. (206) 264-8600
Fax. (206) 264-9300

the forest plan had a specific allowance for temporary roads outside of the no net increase accounting: "Temporary increases (not off-set) in linear miles of total roads are acceptable under the following conditions … These roads shall be closed immediately upon completion of activities requiring use of the road." But here, the 1994 Plan does not have a provision that authorizes temporary road mileage increases outside of the no net increase accounting. *Bradford* does not aid the Forest Service's position.

Thus, even if the Forest Service's mileage numbers were actually cogent and consistent (which they are not), the Project would be in violation of the no-net increase rule because of the temporary roads. Therefore, the Project approval was not in accordance with the law. 5 U.S.C. § 706(2)(A).

### C.   The Project Violates the 1990 Plan Requirement to Meet Forest Plan Requirements for Woodpecker Habitat

The Project violates the 1990 Plan's requirements to preserve woodpecker habitat. The 1990 Plan sets an objective of retaining 40% of the potential population of "cavity nester" (woodpecker) habitat throughout the forest. Dkt. 7-8, AR 02527–03089 (1990 Plan), at AR 02584. In support of this objective, the 1990 Plan sets Standards and Guidelines for "project planning" that incorporates that objective and increase the standard to 80% in crucial riparian areas:

> Retain standing dead and standing green trees sufficient to maintain cavity nester habitat at or above 40% of minimum potential population levels, throughout the managed forest (80% in riparian areas).

Dkt. 7-8, at AR 02691 (1990 Plan).

The Forest Service acknowledges that the 1990 Plan's 40% cavity excavator population standard applies to the Project. *See* FEA, Dkt. 7-39, at AR 19255. However, the Project FEA admits that the Project will not meet this standard. *Id*. at AR 19258 ("modeled expected snags/acre would **not provide adequate numbers to support above 40 percent** of the target primary excavator in the

**Bricklin & Newman, LLP**
Attorneys at Law
1424 Fourth Avenue, Suite 500
Seattle WA 98101
Tel. (206) 264-8600
Fax. (206) 264-9300

projected 100 years") (emphasis added).[4] Instead, the Project area will fall to just 30% cavity excavator population in the lowlands and "less than 30%" in the montane region. *Id.*

In contrast, under the no-action alternative, the Project area would have met the 40% standard—in fact, exceeded it:

> Snag levels in the second growth stands, as modeled out to the year 2116, are projected to contribute to snag levels at the **50% tolerance leve**l for species associated with snags greater than 10" dbh and **50% tolerance level** for species associated with snags greater than 20" dbh for the Western Lowland/Conifer Hardwood Forests (WLCH_S) vegetation types. Snag levels in proposed second growth project stands would contribute to a landscape that would maintain **at least the 80% tolerance level** for species associated with snags greater than 10" dbh and **also an 80% tolerance** level for species associated with snags greater than 20" dbh for the Montane Mixed Conifer Forests (MMC) vegetation types.

FEA, Dkt. 7-39, at AR 19256 (description of "no action" alternative; emphasis added).

In essence, the agency admits that the Project will take an area of forest that would, in its undisturbed state, have complied with the 1990 Plan, but will now, as a result of the Project, fall out of compliance of the Plan. This violates NFMA's requirement that projects be consistent with the forest plan, 16 U.S.C. § 1604(i), and is grounds to vacate the Project decision, 5 U.S.C. 706(2)(A).

In addition, the Forest Service turned a blind eye to the 1990 Plan requirement to provide 80% (not 40%) cavity excavator habitat within riparian areas. Riparian areas are pervasive throughout the Project area, so the 80% habitat rule should have been top of mind. *See* FEA, Dkt. 7-39, at AR 19195 ("84% of the watershed is Riparian Reserve.") Instead, the Forest Service made no effort to demonstrate that the forest will continue to meet the 80% habitat standard for riparian areas post-Project. An agency has a duty to provide a reasoned explanation for its decision. *Alliance for the Wild*

---

[4] There is no separate woodpecker modeling in the FEA for Alternative 2B, the selected alternative. However, Alternative 2 and 2B are similar, except that Alt. 2B affects even more stands than Alternative 2. *See* Decision, Dkt. 7-43, at AR 20271.

**Bricklin & Newman, LLP**
Attorneys at Law
1424 Fourth Avenue, Suite 500
Seattle WA 98101
Tel. (206) 264-8600
Fax. (206) 264-9300

*Rockies v. Savage*, 897 F.3d 1025 at 1036. The Forest Service's failure to address the 80% habitat standard in riparian areas is an additional basis for vacatur.

> ### D.   The Forest Service Failed to Determine Impacts on Sensitive Species and Failed to Survey for Species Subject to a "Survey-and-Manage" Mandate

The 1990 Plan includes special protections for "sensitive species"[5] and "survey-and-manage" species.[6]  However, the Forest Service fails to follow the 1990 Plan's protections for either of these two categories of species in this Project.

> #### 1.   The Forest Service failed to evaluate all sensitive species

The 1990 Plan requires a biological evaluation for sensitive species in the project area and a prohibition on activities that will contribute to their demise:

> All proposed management actions which have the potential to affect habitat of endangered, threatened, or sensitive species will be evaluated to determine if any of these species are present …
>
> When sensitive species are present, a Biological Evaluation shall be completed as described in Forest Service Manual 2670. Habitat for sensitive plants and animals shall be managed to ensure that management activities do not contribute to these species becoming threatened or endangered.

1990 Plan, Dkt. 7-8, at AR 02696.

Sensitive species known or suspected to be present in the Project include peregrine falcon, bald eagle, harlequin duck, common loon, northern goshawk, Townsend's big-eared bat, little brown myotis, Cascade red fox, mountain goat, California wolverine, and various plant or fungus species. FEA, Dkt. 7-39, AR 19237–19239. The Forest Service asserts that its biological evaluation ("BE") of

---

[5] "Sensitive species" are those that are under consideration for listing as threatened or endangered species at either the federal or state level. 1990 Plan, Dkt. 7-8, at AR 02918.

[6] "Survey and manage" species are those that depend on old-growth forest and that are not otherwise protected by the provisions of the 1994 Plan. 2001 Rule, Dkt. 7-14, at AR 07730. Survey and manage species are divided among six categories, depending on their rarity and their amenability to pre-disturbance survey. *Id.* at 07733.

Bricklin & Newman, LLP
Attorneys at Law
1424 Fourth Avenue, Suite 500
Seattle WA 98101
Tel. (206) 264-8600
Fax. (206) 264-9300

the sensitive species satisfies the Plan's requirement to assess the Project's impacts on these sensitive species. *See* Decision, Dkt. 7-43, at AR 20280 (citing BE, Dkt. 7-36, AR 18051–18109).

However, the BE does not actually evaluate whether the Project will "contribute to these [sensitive] species becoming threatened or endangered," as required by the 1990 Plan. For many of the sensitive species (including Cascade red fox, northern goshawk, California wolverine, harlequin duck, and peregrine falcon), there is no citation to any data at all regarding the species' abundance or sensitivity to the Project's logging and road building. Dkt. 7-36, at AR 18088–18091. Thus, there is no basis for the BE's conclusion that the Project will not contribute to the species' listing. The decision is unsupported by substantial evidence and fails the APA requirement that an agency "articulate a rational connection between the facts found and the conclusions reached." *Earth Island Inst. v. U.S. Forest Serv.*, 442 F.3d 1147, 1156–57 (9th Cir. 2006), *abrogated on other grounds by Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 129 S. Ct. 365, 172 L. Ed. 2d 249 (2008). The court should find the Forest Service's decision is not in compliance with the law, 5 U.S.C. § 706, and vacate it.

### 2. The Forest Service failed to conduct pre-disturbance surveys for the Pacific Oregonian snail

The 2001 amendments to the 1994 Plan require pre-disturbance surveys for species categorized as "survey and manage" species Category A or Category C. *See* 2001 Rule, Dkt. 7-14, AR 07660–07813, at AR 07733–07734. The Pacific Oregonian snail (*Cryptomastix devia*) is listed as Category A. *Id*. at 07776. However, the Forest Service did not conduct pre-disturbance surveys for this species.

The FEA acknowledges that the Pacific Oregonian is "suspected" to occur in the Project area. Dkt. 7-39, at AR 19239. Thus, a pre-disturbance survey should have been conducted. However, even though it is suspected to occur, and without undertaking any investigation to establish its occurrence,

Bricklin & Newman, LLP
Attorneys at Law
1424 Fourth Avenue, Suite 500
Seattle WA 98101
Tel. (206) 264-8600
Fax. (206) 264-9300

the authors of the BE chose not to survey "due to the lack old-growth features and the mollusk's

obligate association with Bigleaf maple." BE, Dkt. 7-36, AR 18059.

This rationale for failing to survey for Pacific Oregonian lacks any basis in the record and lacks

a "rational connection" between the facts found and the agency's conclusions. *Earth Island Inst. v.*

*U.S. Forest Serv.*, *supra.* It runs contrary to the statement that the snail is "suspected" to occur and the

agency's similar statements that it cannot assume that the current lack of sightings indicates the snail

is not present. As stated in the EIS for the 2001 Rule:

> Information on both geographic and reference distributions is
> fragmentary or entirely unavailable for all of the species in this group
> because historically, collections were undertaken in limited geographic
> areas and a majority of the Survey and Manage mollusk species were
> undiscovered or unrecognized as distinct species until recently
>
> …
>
> [T]here is a moderate level of uncertainty primarily due to lack of
> knowledge about the historic and current distributions and habitat
> associations for these species.

EIS for the 2001 Rule, Dkt. 7-14, AR 06702–07269, at AR 07076–07077.

The scientific uncertainty acknowledged in the 2001 Rule EIS should have prompted the

Forest Service to conduct a *more* thorough pre-disturbance survey for the Pacific Oregonian, not no

survey at all. There are hundreds of acres of big-leaf maple in the Project area (FEA, Dkt. 7-39, at AR

19177) (big-leaf maples comprise at least 1% of the 65,000-acre Project area) bolstering the likelihood

that the Pacific Oregonian *is* present. The Forest Service's failure to account for sensitive species both

before and after the Project, and the failure to conduct a pre-disturbance survey for Pacific Oregonian,

are not compliant with the 1990 Plan and the 2001 Rule and are grounds to vacate the Decision.

**E.      The Forest Service Failed to Take a Hard Look at the Environmental Impacts of
the Project**

Bricklin & Newman, LLP
Attorneys at Law
1424 Fourth Avenue, Suite 500
Seattle WA 98101
Tel. (206) 264-8600
Fax. (206) 264-9300

NEPA requires the Forest Service to take a "hard look at the likely effects" of a proposed project. "In other words, the Forest Service must 'undertake a thorough environmental analysis before concluding that no significant environmental impact exists.'" *Native Ecosystem Council v. U.S. Forest Serv.*, 428 F.3d 1233, 1239 (9th Cir. 2005) (citing *Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1216 (9th Cir. 1998)).

Critical to the process of understanding a project's impacts is an understanding of the existing conditions prior to the project.

> A baseline is not an independent legal requirement, but rather, a practical requirement in environmental analysis often employed to identify the environmental consequences of a proposed agency action. *See* 54 Fed.Reg. 23756 (1989). Although this Court has had few occasions to address this issue, we have stated that "[w]ithout establishing ... baseline conditions ... there is simply no way to determine what effect [an action] will have on the environment and, consequently, no way to comply with NEPA." *Half Moon Bay Fishermans' Mktg. Ass'n v. Carlucci*, 857 F.2d 505, 510 (9th Cir.1988).

*American Rivers v. Fed. Energy Regulatory Comm'n*, 201 F.3d 1186, 1195, n. 15 (9th Cir. 1999). NEPA requires "high-quality information and accurate scientific analysis. 40 C.F.R. § 1500.1(b)." *See also Lands Council v. Powell*, 395 F.3d 1019, 1031 (9th Cir. 2005).

Here, the Forest Service has not undertaken a thorough environmental analysis of the Project, because, as demonstrated above, it has failed to determine the baseline wildlife populations prior to the Project. Thus, in the 9th Circuit's words, "there is no way to comply with NEPA."

**F.     The Forest Service Failed to Analyze a Range of Reasonable Alternatives**

NEPA requires federal agencies to "study, develop, and describe appropriate alternatives to recommend courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources." 42 U.S.C. § 4332(E). Likewise, the Forest Service is required by its own NEPA rules to analyze alternatives that meet the need for action, unless there are "no

Bricklin & Newman, LLP
Attorneys at Law
1424 Fourth Avenue, Suite 500
Seattle WA 98101
Tel. (206) 264-8600
Fax. (206) 264-9300

1   unresolved conflicts concerning alternative uses of available resources." 36 C.F.R. § 220.7. "The

2   alternatives provision of NEPA applies whether an agency is preparing an EIS or an EA." *Native*

3   *Ecosystems Council v. U.S. Forest Serv.*, 428 F.3d 1233, 1245 (9th Cir. 2005).

4          Here, the FEA does not analyze any alternative besides the Project and no action. Yet, there is

5   unresolved conflict concerning alternative uses of the South Fork Stillaguamish Forest, in that the

6   Forest Service is seeking to build new environmentally destructive roads. However, Alternatives 2

7   and 2A merely adjust the acreage and mileage of Alternative 2B—they do not examine an alternative

8

9   to road-building in the first place. For example, the agency had the option of conducting

10   noncommercial thinning exclusively. That would require no road-building at all and yet could

11   accomplish some or all of the agency's stated objective of enhanced future old-growth habitat by

12   concentrating growth in the larger trees. *See* FEA, Dkt. 7-39, at AR 19132 (non-commercial thinning

13   requires no roads). The agency's failure to analyze that reasonable alternative violates NEPA.

14

15                                   **V.     CONCLUSION**

16          For the foregoing reasons, the Forest Service's Decision and FONSI should both be vacated.

17   The Forest Service should be enjoined from undertaking or authorizing any land-disturbing activities

18   until adequate environmental review has been completed and a new decision that is made based on

19   that review and is consistent with the forest plan's requirements.

20

21

22

23

24

25

26

**Bricklin & Newman, LLP**
Attorneys at Law
1424 Fourth Avenue, Suite 500
Seattle WA 98101
Tel. (206) 264-8600
Fax. (206) 264-9300

1    Dated this 28th day of January, 2021.

2                                          Respectfully submitted,

3                                          BRICKLIN & NEWMAN, LLP

4
                                           /s/ David A. Bricklin, WSBA No. 7583
5                                          /s/ Alexander Sidles, WSBA No. 52832
                                           1424 Fourth Avenue, Suite 500
6                                          Seattle, WA 98101
                                           Telephone: 206-264-8600
7                                          E-mail: bricklin@bnd-law.com, sidles@bnd-law.com
8                                          Attorneys for Plaintiffs

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT - 25
NO. 2:20-CV-01321-RAJ-BAT

Bricklin & Newman, LLP
Attorneys at Law
1424 Fourth Avenue, Suite 500
Seattle WA 98101
Tel. (206) 264-8600
Fax. (206) 264-9300