1

2

3

4

5

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

6

7

NORTH CASCADES CONSERVATION
COUNCIL, KATHY JOHNSON,

CASE NO. 2:20-cv-01321-RAJ-BAT

8

Plaintiffs,

**REPORT AND
RECOMMENDATION**

9

v.

10

UNITED STATES FOREST SERVICE,
VICKIE CHRISTIANSEN, Chief of the
Forest Service; JAMIE KINGSBURY,
Former Forest Supervisor for Mount-Baker
Snoqualmie National Forest; JODY WEIL,
Current Forest Supervisor for Mount-Baker
Snoqualmie National Forest; PETER
FORBES, Former District Ranger for
Darrington Ranger District; ERIN ULOTH,
Former Acting District Ranger for
Darrington Ranger District; GRETCHEN
SMITH, Current District Ranger Darrington
Ranger District; PHYLLIS REED, Project
Lead for Darrington Ranger District,

11

12

13

14

15

16

17

Defendants,

18

and

19

20

HAMPTON LUMBER MILLS-
WASHINGTON, INC., a Washington
corporation, HAMPTON TREE FARMS,
LLC, an Oregon limited liability
corporation, and SKAGIT LOG AND
CONSTRUCTION, INC., a Washington
corporation,

21

22

23

Defendant-Intervenors.

REPORT AND RECOMMENDATION - 1

1    Plaintiffs North Cascades Conservation Council ("N3C") and Kathy Johnson move the court

2  for summary judgment on claims associated with the National Forest Management Act (NFMA), 16

3  U.S.C. § 1600, *et seq*, and the National Environmental Policy Act (NEPA), 42 U.S.C. § 4321, *et seq*.

4  Dkt. 32 (Plaintiffs' Revised Motion for Summary Judgment).[1] Plaintiffs seek vacatur of the Forest

5  Service's Final Decision Notice ("DN") and Finding of No Significant Impact ("FONSI") for the

6  South Fork Stillaguamish Vegetation Project ("the Project") (AR 20268-20318), and to enjoin the

7  Forest Service from proceeding with the Project.

8    Plaintiffs assert that the Forest Service's decision to proceed with the Project was "arbitrary

9  and capricious" and should be set aside because (1) the Project violates the NFMA in that it does not

10  conform to certain aspects of the 1994 Northwest Forest Plan for the Mt. Baker-Snoqualmie National

11  Forest, as amended; and (2) the Project violates the NEPA in that there are deficiencies in the Forest

12  Service's Environmental Assessment ("EA") and FONSI.[2]

13    The Forest Service lodged the Administrative Record (AR) on November 13, 2020 (Dkt. 7)

14  and the Supplemental AR (Supp. AR) on March 22, 2021. Dkt. 28. By agreement of the parties, no

15  cross-motion will be filed by the Forest Service. The parties have stipulated that if Plaintiffs'

16  motion for summary judgment is denied, summary judgment should automatically be entered in

17  favor of the Forest Service pursuant to Fed. R. Civ. P. 56(f)(1). *See* Dkt. 24, ¶ 1; *and see Karuk*

18  *Tribe of California v. U.S. Forest Serv.*, 681 F.3d 1006, 1017 (9th Cir. 2012) (en banc)

19  ("Because this is a record review case, we may direct that summary judgment be granted to

---

20  [1] Pursuant to the Court's March 15, 2021 Order (Dkt. 27), this revised motion replaces Plaintiff's
    earlier motion for summary judgment (Dkt. 21).

21
22  [2] To the extent Plaintiffs' Complaint includes additional claims which are not included in their
    Revised Motion for Summary Judgment (*see, e.g.*, Dkt. 1 (Second, Fourth, and Fifth Claims),
    those claims are waived. *See SPRAWLDEF v. FEMA*, 717 Fed. App'x 733, 733-34 (9th Cir.
    2018); *Friends of the Wild Swan v. Weber*, 955 F.Supp.2d 1191, 1197 (D. Mont. 2013), *aff'd*,
23  767 F.3d 936 (9th Cir. 2014) (noting because the plaintiffs had failed to raise certain arguments
    in their summary judgment motion, they were waived).

1   either party based upon our review of the administrative record.") Additionally, pursuant to the

2   stipulation of the parties, this Court is not required to "[afford] plaintiffs any additional notice or

3   opportunity to respond as provided in the Rule" before entering summary judgment in favor of

4   the Forest Service. *Id*.

5   The undersigned has determined that the Forest Service's DN and FONSI for the Project

6   (AR 20268-20318) was not arbitrary and capricious. Thus, it is recommended that Plaintiff's

7   motion for summary judgment (Dkt. 32) be denied and that the Court enter summary judgment in

8   favor of the Forest Service.

## BACKGROUND

A.  Plaintiffs and Intervenors

Plaintiffs filed their complaint on September 3, 2020, over a year after the Forest Service

issued the DN and FONSI. Dkt. 1. Plaintiff N3C is a non-profit environmental organization

established in 1957, with 400 members dedicated to protecting the North Cascades ecosystems

for its inherent natural values and for the scientific and recreational opportunities it provides to

N3C members and the public at large. N3C submitted a formal objection to the Project in

accordance with the administrative exhaustion requirements of 36 C.F.R. Part 218. *See* N3C

Objection, Dkt. 7-40, AR 19575–19602 (Nov. 7, 2017). On several occasions in December 2017,

N3C participated in meetings with the Forest Service to resolve its objections to the Project. *See*

Objection Meeting Notes, Dkt. 7-40, AR 19603–19604 (Dec. 15, 2017); AR 19605–19607, (Dec.

17, 2017); AR 19608–19614 (Dec. 19, 2017).

Plaintiff Kathy Johnson, a member of N3C, hikes, birdwatches, gathers mushrooms,

berries, and medicinal plants, and enjoys the serenity and beauty of the forest in the South Fork

Stillaguamish area. Ms. Johnson submitted comments about the Project on behalf of the Pilchuck

1    Audubon Society and N3C. *See*, *e.g.*, Dkt. 7-40, AR 19576; AR 19603–19604.

2    Intervenors Hampton and Skagit Log hold three contracts associated with implementation

3    of the Project: Bonanza Thin DxP Timber Sale, Mallardy Thin DxP Stewardship Contract, and

4    Green Grouse Stewardship Contract. Dkt. 16, Price Decl. ¶¶ 18, 25; Dkt. 17, Declaration of

5    Lincoln Torgerson, ¶ 4. Together, these contracts will produce about 19.5 million board feet

6    (MMBF), which was the Forest's entire timber sale volume for Fiscal Year 2020. Mallardy Thin

7    and Green Grouse are "stewardship" contracts pursuant to 16 U.S.C. § 6591c, whereby

8    contractors remove material that is both commercially valuable and not valuable. The value of

9    the timber is then offset against payments otherwise due for forest restoration work. 16 U.S.C. §

10   6591c(d)(4)(A); *see also* AR 19123 (noting that the total amount of non-commercial acres that

11   will be treated would be determined by the funds generated by the commercial thinning).

12   Congress enacted authority for these contracts to "achieve land management goals for the

13   national forests and the public lands that meet local and rural community needs." 16 U.S.C. §

14   6591c(b). In addition to commercial and non-commercial thinning, the contracts include fish

15   passage improvements and culvert replacements, road rehabilitation for access to recreation

16   areas, weed abatement, and work to reduce sedimentation risk. Dkt. 16, Price Decl. ¶¶ 20, 27-28;

17   Dkt. 17, Torgerson Decl. ¶¶ 4, 6, 10. The commercial timber volume from the project will help

18   support Hampton's mill operations in Darrington and other regional mills. Dkt. 16, Price Decl. ¶

19   17; Dkt. 17, Torgerson Decl. ¶ 5. Hampton's Darrington mill employs about 170 people in a

20   rural community of 1,400 people and the community's vitality is directly tied to that mill. Dkt.

21   16, Price Decl. ¶¶ 8-9. The activities under the Project will also provide employment for workers

22   with Hampton, Skagit Log, and their sub-contractors. *See* Dkt. 17, Torgerson Decl. ¶ 3 (Skagit

23   Log currently employs 9 people). These family-wage jobs are an essential element of the

1   economy in rural Skagit and Snohomish Counties. The project will also provide work for three

2   small contracting companies in Snohomish and Skagit Counties, which collectively employ

3   about 95 people in total. Dkt. 16, Price Decl. ¶¶ 21, 29.

4        Hampton performed some road maintenance work at the end of September 2020. Dkt. 16,

5   Price Decl. ¶ 20. However, further ground-disturbing activities for all three sales cannot

6   commence until July 1, 2021. Dkt. 26 (Stipulation at 2) ("the Forest Service has agreed that it

7   should voluntarily delay ground disturbing activities in support of the Project that is the subject

8   of this lawsuit until July 1, 2021").

9   B.    Factual Background

10       The Project is in the Darrington Ranger District on the Mt. Baker-Snoqualmie National

11  Forest, in Snohomish County. AR 19101. The principal purpose of the Project is set forth in the

12  DN:

13       The SF Stillaguamish area was logged extensively from the 1940s through the
         early 1980s. Today, it is important to take action to ensure that this forest stays
14       healthy and is able to support a range of old-growth dependent plants and animals.
         This is the central focus of this project's "purpose and need."
15
16  AR 20268. The need for the Project stems from the consequences of past logging which occurred

    during a less environmentally enlightened age of forest management. The EA notes that:
17
18       Past timber harvesting crossed both upland slopes, riparian areas and streams, and
         while there was some pre-commercial thinning, much of the current [second
19       growth] stands have high tree densities, little diversity of understory, and limited
         stand structure in canopy height. *See* USDA Forest Service 1995, pp. 3-25. The
         high stocking levels and homogenous stand conditions limit the development of
20       stand structure for old forest associated species.

21  AR 19106. The case for active forest management under these circumstances to improve forest

22  conditions, is well-documented in the available literature, as recounted in the EA. AR 19106-

23  19107. "The preponderance of the best available scientific evidence demonstrates thinning in

dense managed stands can enhance conditions favorable for developing old growth upland and riparian forest characteristics and increasing habitat diversity." *Id.* Thus, among the most important purposes of the proposed treatment is to provide desired levels of habitat for species associated with old growth forests, including the Northern spotted owl, the marbled murrelet, and other species of concern within the SF Stillaguamish watershed. AR 19103. It is anticipated that the Project will accomplish these goals by:

> Thin[ning] previously harvested stands that are currently 20 to 80 year second growth stands of age within the SF of the Stillaguamish River drainage. The goals of the stand treatments are to promote old forest characteristics with large diameter trees, stands with multiple layers of canopy, and the retention of down wood and snag components. The proposed thinning also has the goals of enhancing species diversity, maintaining a high rate of growth on dominant trees, developing desired vegetation stocking and diversity in Riparian Reserves, and promoting desired growth and stand conditions across the landscape for resiliency to climate change.

AR 19108. Although the entire Project planning area encompasses 65,000 acres, the Project will only commercially thin between 2,000 to 3,300 acres and authorizes 1,060 acres of non-commercial thinning. AR 20268-69.

A secondary purpose of the Project is to address issues associated with certain recreational areas within the Project area where the facilities have proved inadequate for the level of use by recreationalists. AR 19109. There is a need to manage the Forest Service's road and trails systems to meet Tribal and visitor use and to meet the needs for administrative management of Forest Service lands. AR 19108-09. The Project area is within a one-hour drive of the Seattle metropolitan area and the visitation at facilities and recreation sites averages between 17,000 and 20,000 visitors during the peak season (April-October). *Id.* The Project area is within accustomed lands for several tribes, and the Forest Service has a trust responsibility to protect and enhance resources, habitat areas and places where tribal hunting, fishing, gathering

REPORT AND RECOMMENDATION - 6

and other treaty rights are exercised. AR 19101. The Project will upgrade, store and decommission roads within the Project area, provide trail and trailhead upgrades and visual quality management, and provide Aquatic Organism Passage ("AOP") improvements. AR 20269-70. The management of infrastructure and facilities will support the goals of the LSR and meeting Tribal and recreational use within the watershed. AR 19109.

The Forest Service will also commence a needed assessment of recommendations in the Sustainable Road System Report (2015) for the road system within the Project area. AR 19108, 19109; *and see* AR 19119. Among other actions, seventeen miles of National Forest System road no longer needed for forest management will be decommissioned. AR 20294-20295. "Decommissioning" generally describes a variety of activities such as placing physical barriers to prevent vehicle access and travel, removal of culverts, restoration of natural drainage, revegetation, etc. *See* AR 20291, n.1

Although five alternatives for meeting the Forest Service's goals were initially considered, ultimately a "no action" alternative, and an "Alternative 2" were carried forward for detailed analysis in the EA. AR 19121. (The alternatives not carried forward for detailed analysis are set forth at AR 19163-19165, and a table comparing the alternatives is set forth at AR 19167.)

Alternative 2 was modified based upon comments received from the public and Tribes during scoping, resource specialists' findings in the field, and assessments of resource information. *Id*. In summary, Alternative 2 consists of:

> [F]orest stand management and connected ground-disturbing actions, road management actions, aquatic restoration actions and recreation management. Thinning treatments would be applied to a portion of the stands within the 65,000 acre project area. Road management maintenance levels would be changed to better align the road system maintenance with projected uses, and remove existing fish migration barriers to improve aquatic organism passage. Recreation sites in

proximity to stand treatment areas would be upgraded to better meet needs
identified at existing trailheads and travel routes.

AR 19123. A detailed description of the components of Alternative 2 are set forth in the EA at
AR 19123-19138.

On March 1, 2016, the Forest Service provided the public with an opportunity to
comment during the scoping period and received 16 comments from interested parties. AR
20275. The Forest Service held a field trip on October 8, 2016 and a public meeting on October
11, 2016 to share information regarding the Project. *Id*. The Forest Service circulated a draft EA
for public comment and received comments from 10 organizations and 200 individuals, mainly
form letters. After the draft DN and Final EA was issued, an objection resolution meeting was
held on December 19, 2017. AR 19605-07; 19608-01 (meeting notes). Based on those
objections, the Forest Service issued an Errata to the Final EA. AR 20260-67. After conducting
the environmental review process over a three-year period, the Forest Service issued the DN
approving the Project on May 31, 2019. AR 20268-81.

The Project received support from the Darrington Collaborative. Dkt. 16, Declaration of
Anjolene Price, Ex. A. Dkt. 16-1. The Collaborative is "a partnership between diverse interests
such as major conservation organizations, local STEM education programs, the local timber
industry, and the community of Darrington, with the goal of increasing ecologically sustainable
timber harvests in the Darrington region, creating jobs, and improving and restoring the health of
forests and watersheds." *Id*., Price Decl., Ex. A at 1; *see id*. at 4 (listing signatories). In 2019, the
Collaborative received a Building Forest Partnership Grant of $40,000 to hire a part-time
coordinator to support forest restoration work on the Mt. Baker Snoqualmie National Forest and
received an All Lands Forest Restoration Grant of approximately $99,300 in 2018 and $211,500
in 2019 to support restoration forestry work, including thinning dense stands, doing stand exams,

1   road inventories, and pre-sale work. *Id*., Price Decl. ¶ 14. In addition, the Darrington

2   Collaborative received funds from Pew Trusts and hired Resilient Forestry to assist with pre-sale

3   work for the SF Stillaguamish Project, resulting in approximately 192 hours of work related to

4   GPS mapping, cruising and pre-sale layout. *Id*. In response to this litigation, the Collaborative

5   issued a letter of support for the Project, noting the Project provides "a balance between several

6   important values on the Forest." *Id*., Price Decl., Ex. A at 3. The support letter stated, "Overall,

7   we believe these treatments, over time, will increase the diversity, habitat value, and resilience of

8   these stands and the landscape." *Id*. It also reiterated support for "collaborative projects that

9   appropriately balance ecosystem goals and restoration opportunities with a viable wood products

10  industry that provides jobs and economic benefits to rural communities." *Id*. at 4.

11          In response to new information from field crews and comments from the public and

12  Tribes during scoping, Alternative 2 was modified to encompass an "Alternative 2A" and an

13  "Alternative 2B." AR 19123. Although very similar to Alternative 2, both Alternative 2A and 2B

14  made minor changes in the stands proposed for thinning and road decommissioning. AR 19123.

15  (The similarities and differences between Alternatives 2, 2A and 2B are set forth in the EA at AR

16  19139-19145). Additionally, for proposed Alternative 2 and its two variations, the DN

17  incorporates extensive management requirements and mitigation measures that were developed

18  to avoid, reduce, eliminate, rectify, or compensate for unwanted effects from project activities.

19  AR 20302-20316 (DN); and see AR 19146-19162 (EA).

20          The Forest Service evaluated the expected direct and indirect environmental effects, the

21  cumulative environmental effects, and Forest Plan consistency of the no action alternative and

22  the action alternatives on forest vegetation, hydrology, soils, fish, wildlife, air quality, and more.

23  AR 19169-19329. The Forest Service found no adverse environmental impact of significance

REPORT AND RECOMMENDATION - 9

1    that would result from the Project. On May 31, 2019, Erin Uloth, Acting District Ranger for the

2    Darrington District, signed the DN and FONSI for the Project. AR 20281.

3    C.    Legal Background

4          1.    The National Environmental Policy Act ("NEPA")[3]

5          When a particular federal action significantly impacts the environment, NEPA requires

6    federal agencies to prepare an Environmental Impact Statement ("EIS"), which is a detailed

7    statement on the environmental impact of "major Federal actions significantly affecting the

8    quality of the human environment." 42 U.S.C. § 4332(2)(C). To determine whether a particular

9    federal action significantly affects the environment, an agency may first prepare an

10   Environmental Assessment ("EA"), which is a "concise public document" that serves to "briefly

11   provide sufficient evidence and analysis for determining whether to prepare an [EIS]." 40 C.F.R.

12   §§ 1501.3, 1508.9, 1508.13 (2019); *Native Ecosystems Council v. Dombeck*, 304 F.3d 886, 892

13   (9th Cir. 2002). An EA is required to "include brief discussions of the need for the proposal, of

14   alternatives as required by section 102(2)(E), of the environmental impacts of the proposed

15   action and alternatives, and a listing of agencies and persons consulted." *Id.*; 40 C.F.R.

16   §1508.9(b) (2019).

17         An EA is not required to include the same level of detailed analysis which is required of

18   an EIS. *See California Trout v. Federal Energy Regulatory Commission*, 572 F.3d 1003, 1016

19   (9th Cir. 2009). If an agency determines that an EIS is unnecessary, it issues a FONSI, briefly

20

21   ───────────────
     [3] The Council on Environmental Quality promulgated regulations implementing NEPA in 1978,
22   43 Fed. Reg. 55,978 (Nov. 29, 1978), and made substantive amendments to those regulations in
     1986, see 51 Fed. Reg. 15,618 (Apr. 25, 1986). Last year, the Council published a new rule,
23   effective September 14, 2020, which revises the 1978 regulations. 85 Fed. Reg. 43,304 (July 16,
     2020). Plaintiffs' claims arise under the 1978 regulations, as amended in 1986 (codified at 40
     C.F.R. Part 1500 (2019)).

1    outlining why the project, considering any mitigation measures, will have no significant impact

2    on the human environment. *Dep't of Transp. v. Public Citizen*, 541 U.S. 752, 757-58 (2004); 40

3    C.F.R. §§ 1501.4(e), 1508.13 (2019).

4        2.    The National Forest Management Act ("NFMA")

5        NFMA sets the statutory framework for the management of our National Forest lands.

6    16 U.S.C. § 1604. NFMA establishes a two-step process for forest planning. First, the NFMA

7    requires the Forest Service to develop and maintain a Forest Plan for each unit of the National

8    Forest System. *See* 16 U.S.C. § 1604(a). Each Forest Plan must set forth multiple use objectives

9    to ensure recreation uses, maintain a diversity of plant and animal species, maintain the viability

10   of native species, and enable timber yield from the forests. *See* 16 U.S.C. § 1604(e). NFMA also

11   requires that the Forest Service adopt regulations specifying guidelines for forest plans. 16

12   U.S.C. § 1604(g)(3); *and see* 36 C.F.R. § 219 *et seq*. Second, under the NFMA, the Forest

13   Service implements each forest plan by approving or disapproving site-specific actions. All

14   proposed projects must be consistent with the overall forest plan. 16 U.S.C. § 1604(i).

15       The Forest Service's management of the Mt. Baker-Snoqualmie National Forest is

16   subject to the 1994 Northwest Forest Plan and the 1990 Forest Plan. The 1994 Northwest Forest

17   Plan, which amended the 1990 Forest Plan, applies across the entire forest and has several types

18   of land classifications, including Late Successional Reserves (LSRs) and Riparian Reserves, with

19   different Standards and Guidelines that apply. The project lies within the Independence LSR. AR

20   19113. The 1994 Northwest Forest Plan authorizes activities in LSRs to protect and enhance

21   habitat conditions for late-successional and old-growth related species, including the marbled

22   murrelet and northern spotted owl. AR 19114; AR 06492 ("The objective of Late-Successional

23   Reserves is to protect and enhance conditions of late successional and old-growth forest

ecosystems, which serve as habitat for late-successional and old-growth related species including the northern spotted owl."). In Riparian Reserves, the 1994 Northwest Forest Plan establishes an Aquatic Conservation Strategy and allows silvicultural practices to be used to control stocking, reestablish and manage stands, and acquire desired species composition and structural diversity of plant communities. AR 19114; *see generally* AR 06458.

The Forest Service is entitled to deference in its interpretation of its Forest Plans. *Native Ecosystems Council v. U.S. Forest Serv.*, 418 F.3d 953, 960 (9th Cir. 2005). "[The] NFMA embraces concepts of 'multiple use' and 'sustained yield of products and services,' obligating the Forest Service to 'balance competing demands on national forests, including timber harvesting, recreational use, and environmental preservation.'" *Nat. Res. Def. Council v. U.S. Forest Serv.*, 421 F.3d 797, 801 (9th Cir. 2005). The Forest Service has broad discretion in balancing these competing objectives:

> The NFMA gives the Forest Service flexibility because the Service has many different goals—conservation, commerce, recreation, and so on. The statute reflects a congressional judgment that balancing these goals calls for policy judgments—judgments that often require trade-offs among worthy objectives . . . Congress left such judgments to a politically responsive agency with relevant expertise . . . Courts are not well-equipped to police the substance of these judgments. Instead, we employ procedural tools: In a nutshell, the agency must rationally explain why it did what it did.

*In re Big Thorne Project*, 857 F.3d 968, 976 (9th Cir. 2017).

"While NFMA requires that the proposed site-specific actions be consistent with the governing Forest Plan, the Forest Service's interpretation and implementation of its own forest plan is entitled to substantial deference." *Native Ecosystems Council v. Weldon*, 697 F.3d 1043, 1056 (9th Cir. 2012). "When determining whether [an action] is consistent with the Forest Plan, [courts] are not permitted to analyze the issue in a vacuum. Instead, federal courts are required to defer to an agency's reasonable interpretation of its own guidelines . . . ." *Forest Guardians v.*

*U.S. Forest Serv.*, 329 F.3d 1089, 1098 (9th Cir. 2003). "In the face of ambiguity," courts will "defer to the Forest Service's reasonable interpretation of the Forest Plan's requirements." *All. for the Wild Rockies v. Bradford*, 856 F.3d 1238, 1242 (9th Cir. 2017) (citation and internal quotation marks omitted).

## STANDARD OF REVIEW

A.    <u>Summary Judgment Standard</u>

Summary judgment is proper if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Summary judgment is a particularly appropriate tool for resolving claims challenging agency action. *See Occidental Eng'g Co. v. INS*, 753 F.2d 766, 770 (9th Cir.1985). Summary judgment is appropriate in this case because the issues presented address the legality of Defendants' actions based on the administrative record and do not require resolution of factual disputes.

B.    <u>Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706, et seq</u>

Neither NEPA, nor the NFMA provide a private right of action. *Lujan v. National Wildlife Federation*, 497 U.S. 871, 882-83 (1990) (NEPA); *Forest Guardians v. U.S. Forest Serv.*, 641 F.3d 423, 428 (10th Cir. 2011) (NFMA). Thus, to obtain judicial review of a claim that these statutes have been violated, a plaintiff must rely upon the APA. 5 U.S.C. § 702.

Under the APA, a final agency action may be set aside only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). *Ranchers Cattlemen Action Legal Fund United Stockgrowers of America v. U.S. Dep't. of Agriculture*, 499 F.3d 1108, 1114-1115 (9th Cir. 2007). The Court must determine whether the agency

1  "considered the relevant factors and articulated a rational connection between the factors found

2  and the choices made." *City of Sausalito v. O'Neill*, 386 F.3d 1186, 1206 (9th Cir. 2004) (citation

3  omitted). This standard of review is "highly deferential, presuming the agency action to be valid

4  and affirming the agency action if a reasonable basis exists for its decision." *Independent*

5  *Acceptance Co. v. California*, 204 F.3d 1247, 1251 (9th Cir. 2000) (citations omitted).

6       Review under the APA is "searching and careful." *Ocean Advocates v. United States*

7  *Army Corps of Eng'rs*, 402 F.3d 846, 858 (9th Cir.2005). However, the court may not substitute

8  its own judgment for that of the agency. *Id*. In short, the court must ensure that the agency has

9  taken a "hard look" at the environmental consequences of its proposed action. *Oregon Natural*

10  *Resources Council v. Lowe*, 109 F.3d 521, 526 (9th Cir.1997). An agency violates the APA only

11  if it has "relied on factors which Congress had not intended it to consider, entirely failed to

12  consider an important aspect of the problem, offered an explanation for its decision that runs

13  counter to the evidence before the agency, or is so implausible that it could not be ascribed to a

14  difference in view or the product of agency expertise." *Nat'l Ass'n of Home Builders v.*

15  *Defenders of Wildlife*, 551 U.S. 644, 658 (2007) (internal quotations omitted); *see also*, *The*

16  *Lands Council v. McNair*, 537 F.3d 981, 994 (9th Cir. 2008) (en banc), *abrogated in part on*

17  *other grounds by Am. Trucking Ass'ns, Inc. v. City of Los Angeles*, 559 F.3d 1046 (9th Cir. 2009)

18  ("the Forest Service acts arbitrarily and capriciously only when the record plainly demonstrates

19  that the Forest Service made a clear error in judgment . . . .")

20       **DISCUSSION**

21       Plaintiff asserts the following claims under NFMA: (1) the Project violates the 1994

22  Northwest Forest Plan's requirement that there will be no net increase in the miles of roads in

23  Key Watersheds; (2) the Forest Service violated the 1990 Forest Plan's objective to retain

standing dead and green trees to maintain woodpecker habitat; and (3) the Forest Service did not

adequately analyze the impacts to sensitive species, as required by the 1990 Forest Plan, and

failed to comply with its "survey and manage" obligations under the 1994 Northwest Forest

Plan. Plaintiffs also assert that the Forest Service violated NEPA by failing to a "hard look" at

the Project's effects (*i.e.*, by failing to determine the baseline wildlife populations in the project

area and failing to consider a reasonable range of alternatives).

**A.    NFMA**

    1.    <u>Net Increase in Roads in Key Watersheds</u>

    The 1994 Northwest Forest Plan provides Standards and Guidelines for Key Watershed

Areas, requiring "no net increase" in the amount of roads:

> Outside Roadless Areas - Reduce existing system and nonsystem road mileage. If
> funding is insufficient to implement reductions, there will be *no net increase* in
> the amount of roads in Key Watersheds.

AR 06490 (emphasis added). The SF Stillaguamish Watershed, where the Project is located, is a

Tier 1 key watershed, and the Final EA noted that "existing road system and nonsystem road

mileage will be reduced, with restoration a high priority for these watersheds," as required by the

1994 Northwest Forest Plan. AR 19114. The DN/FONSI explain how the Project will meet this

requirement by relying on either open, stored, or temporary roads:

- The Project will use "57 miles of open Forest System roads," *i.e.* existing
  National Forest System roads that are open for public use, which will remain in
  existence after the project ends. AR 20269, 20290.

- The Project will reopen and use "29 miles of closed roads" (roads that are closed
  and stored for future use (ML1)). Those roads will be "treated to maintain
  appropriate hydrological function and closed through the timber sale contract after
  harvesting activities." AR 20290.

- The Project will use 12 miles of existing "unspecified," *i.e.*, non-National Forest
  System roads, and 15 miles of "former temporary roads," *i.e.*, leftover road prism
  used in connection with past activities and then abandoned. These "temporarily

opened roads" will be "hydrologically treated and decommissioned after harvesting activities." AR 20291.

- The Project will use approximately 5 miles of "new temporary roads." These roads are being used in areas in which preexisting roads were deemed inadequate, and they will be decommissioned following thinning activities. *Id*.

- The Project will decommission 16.8 miles of "non-driveable National Forest System" roads no longer needed for forest management. AR 20270, 20294.

- The Project will convert 1.8 miles of open National Forest System road in two recreation areas from roads to trails. AR 20270, 20293-94, 20295-20301.

The Errata to the Final EA identifies the changes in the maintenance levels under Alternative 2B, demonstrating that the reclassification of those roads also results in no net increase:

- Decommission approximately 17 miles of National Forest System road no longer needed for forest management (currently non-drivable).

- Store an additional 15 miles of road (ML 1) for a total of approximately 60 miles in closed ML1 status.

- Manage 14 miles in ML 2 for high-clearance vehicles with an additional approximately 8 miles in ML 2A administratively closed status (providing gated access to private land or rock sites).

- Manage approximately 41 miles as ML 3 (passenger vehicle) with all trailheads accessible by ML 3 roads.

- Retain approximately 5 miles of ML 4 (passenger comfort) road.

- Convert approximately 1.8 miles (3 road segments) from NFS road to trail.

- Use and then decommission approximately 23 miles of non-system roads.

AR 2066-67; AR 20270 (Table 1 showing changes in maintenance levels); *see also* AR 19298 (definitions of maintenance levels 1-5 and unclassified roads). The Final EA also provides a Road Status Map, which displays which roads would be open, administratively closed, closed, or decommissioned within the project area. AR 19317 (Figure 34).

REPORT AND RECOMMENDATION - 16

1    Thus, the Forest Service contends that the Project does not violate the "no net increase"

2    standard because the Project does not add any road mileage to the Project area; all  temporary

3    roads used in connection with the Project will be decommissioned before the end of the Project;

4    and at the end of the Project, there will be a net *decrease* in road mileage of approximately 18.6

5    miles of preexisting National Forest System roads in the Project area. *See*, *e.g.*, Dkt. 35, p. 8.

6    Plaintiffs contend that the Forest Service's description of the existing and proposed roads

7    is confusing and contradictory, in a manner that conceals both the existing and the proposed

8    mileage, and that the figures do not add up to no net increase. Plaintiffs first argue that the Forest

9    Service has failed to describe which roads are included in its "baseline" inventory," thus making

10    it impossible to determine whether the total mileage of roads post-project is greater or less than

11    the pre-project baseline. Dkt. 32, pp. 14-17 (referring to Dkt. 7-39, Table 33, AR 19299).

12    a.    Baseline Inventory

13    Plaintiffs rely on *Alliance for the Wild Rockies v. Savage*, 897 F.3d 1025, 1036

14    (9th Cir. 2018) for the proposition that "if the Forest Service fails to indicate which roads are

15    included in its 'baseline' inventory of roads, the Service cannot demonstrate compliance with

16    forest plan requirements to avoid increasing road mileage." Dkt. 32, p. 14, l. 22 - p. 15, l.

17    The system at issue in *Savage* was based on a calculated number intended to reflect the

18    total number of existing lineal road miles (1,123.9 linear miles) within a "Bears Outside Recover

19    Zone" polygon, referred to as a "BORZ polygon". Under this system, the calculated number

20    becomes a firm numerical "baseline cap." Thus, if the calculated number of road miles within a

21    BORZ polygon was X, the baseline cap for that BORZ polygon was also X, and a project was in

22    violation of the relevant standard if, at the end of the project, the number of road miles in the

23    relevant BORZ polygon exceeded X. *Id.* at 1035. In *Savage*, the Court concluded that the Forest

1    Service could not demonstrate that it had met the "no net increase" standard in the BORZ

2    polygon through the decommissioning of non-National Forest System Roads because the Forest

3    Service was unable to demonstrate that the established baseline cap included both non-National

4    Forest System road mileage and existing National Forest System road mileage. *Id.* at 1036-1037.

5        In contrast, there is no fixed numerical baseline cap here nor does the applicable standard

6    distinguish between National Forest System roads and non-National Forest System (*i.e.*,

7    "undetermined") roads. Instead, the standard provides that "[t]he amount of *existing system and*

8    *nonsystem roads* within Key Watersheds should be reduced through decommissioning of roads."

9    AR 06468 (emphasis added). Plaintiffs acknowledge that while there is no fixed numerical

10   baseline cap, they argue there is no way to measure whether a "no net loss" has been achieved

11   without first having an accurate tally of the road mileage within the Project area. Although Table

12   33 identifies 197.9 total "existing transportation system road miles" within the Project area,

13   Plaintiff's conclude (by comparing Table 33, Table 44, and the Errata), that the Forest Service's

14   calculations are "riddled with error."

15            b.    "Commingling" Unclassified and Decommissioned Roads

16        Plaintiffs first criticize the Forest Service for combining unclassified and decom-

17   missioned road mileage (shown as a total of 23 miles) in Table 33. Unclassified roads are

18   defined as roads that "are not managed as part of the forest transportation system, including those

19   roads that were once under permit or other authorization and were not decommissioned upon the

20   termination of the authorization"; whereas, decommissioned roads are roads that no longer serve

21   as "current or planned future access need[s] and ha[ve] been removed from the transportation

22   system maps and database." AR 19298, 19380. Table 33 identified 197.9 total "existing

23   transportation system road miles" within the Project area, with 23 miles of roads under the

     "unclassified" maintenance level category that included both unclassified and decommissioned

1    roads. AR 19299. According to Plaintiff's decommissioned roads should not have been included

2    in the "baseline" inventory. Dkt. 32, at 10-11.

3        Field review by the Forest Service (*see* Supp. AR 00051-00633), determined that

4    supposedly decommissioned roads had not been properly decommissioned. *See e.g.* Supp. AR

5    00316-000320 (field inventory of a "decommissioned" road (4038) in need of hydrologic

6    treatment). Therefore, for purposes of this table, the Forest Service categorized both supposedly

7    "decommissioned roads" and unclassified roads together under the category of "Unclassified

8    Roads." *See* Forest Service Manual (FSM) § 7705 (2007). In addition, Final EA's Table 44

9    compared the existing road miles with Alternatives 2, 2A, and 2B and separated unclassified

10   roads from decommissioned roads. AR 19313. Table 44 identified unclassified roads under the

11   "unclassified" maintenance level category and decommissioned roads under the "0" maintenance

12   level category and did not include any decommissioned roads miles in the existing baseline. AR

13   19313. Therefore, the Forest Service relied on an accurate pre-project baseline of 197 miles of

14   road in its analysis by excluding any miles of decommissioned roads. *Id*.

15       More importantly, the Forest Service's decision to combine unclassified and

16   decommissioned road mileage in Table 33 does not bear on the proper application of the "no net

17   increase" standard because, as explained by the Forest Service, the Project will use only 12 miles

18   of roads in this "commingled" category of unclassified and decommissioned roads as temporary

19   roads and all temporary roads will be decommissioned at the end of the Project. Although

20   Plaintiffs accuse the Forest Service of being "disingenuous" in this "commingling" (*see* Dkt. 32,

21   p. 17), it is not clear what the Forest Service gains by engaging in such a scheme. If the Project

22   does not result in the addition of any new road mileage to the Project area and all temporary

23   roads will be decommissioned before the end of the Project, it is of no consequence that the

1  Forest Service "commingled" unclassified and temporary roads in Table 33.

2        Plaintiffs also point out that in Table 33 (AR 19299), 23 miles of Unclassified Roads are

3  identified while, in Table 44 (AR 19313), 22 miles of Unclassified Roads are identified. Dkt. 32,

4  p. 20, *ll*. 3-9. Plaintiffs also take issue with how the Benson Creek Road segment (FS 400500)

5  was identified as "decommissioned" in the Forest Service's spreadsheets but classified as

6  "unspecified" in the Transportation Report. Dkt. 32, at 17 (citing Supp. AR 640-643, AR 21).

7  However, the Court concludes that the Forest Service has adequately explained in the Final EA

8  that minor adjustments of this nature are inevitable during the development of a project –

9  ("minor changes in road mileage resulting from review of road number during the response to

10  comment period, and from new information gained in continuing field reconnaissance.") AR

11  19315 (noting that the total miles of unspecified or decommissioned roads totaled to 23 miles);

12  *see also* Supp. AR 00051-00633 (Survey data). "For example, there was a need for clarification

13  on road numbers . . . . Benson Creek Road (FSR 4005) was previously shown in the Forest

14  Service database from MP 0 to MP 1 as a County Road and MP 1 to MP 3.5 as a

15  decommissioned road." AR 19315.

16        The Forest Service provides the further explanation that, the purpose of Table 44 (AR

17  19313) is not to demonstrate that the Project will result in no net increase in road mileage.

18  Instead, Table 44 demonstrates how the maintenance levels of the roads in the Project area will

19  be altered by Alternatives 2, 2A and 2B. For example, Category "ML0" in the table is correctly

20  displaying that the Project will result in the decommissioning of 17 miles of current National

21  Forest System road. The table is also correctly displaying that all 22 miles of unclassified roads

22  are proposed for decommissioning (hydrologic treatment if needed) in any of the alternatives.

23  The difference is that the portion of the unclassified roads that will be used as temporary roads in

1  the Project will be decommissioned following their use. The remaining portions of the

2  unclassified roads, *i.e.*, those that will not be used as temporary roads in the Project, will be

3  hydrologically stabilized if needed using other funding sources. Dkt. 35, p. 13, n.15.

4      Furthermore, the nominal difference of 1 mile is meaningless in the context of Plaintiffs'

5  claim because the Project does not violate the "no net increase" standard whether the actual

6  figure is closer to 22 miles or 23 miles.

7              c.      Calculation of Temporary Roads

8      Plaintiffs also argue that the Forest Service made a calculation error when it

9  claimed that it would reopen 29 miles of roads as temporary roads that would later be

10  decommissioned because the DN/FONSI identifies using 12 miles of non-system roads and 15

11  miles of road prism from previous timber harvest as temporary roads, which equals 27 and not

12  29 miles of road. Dkt. 32, p. 11.

13      The record reflects that "[r]oad usage in the project area includes temporary roads, roads

14  in storage (Maintenance Level (ML 1) and open road systems (ML2 and above)," which are to

15  be utilized as follows:

16      1)      57 miles (of the 103.4 miles) of "open roads" that already exist in the Project area

17  and which will remain in existence after the Project ends. AR 20269, 20290. There is no net

18  increase here.

19      2)      29 miles (of the 71.5 miles) of "stored roads" (roads within the National Forest

20  System that are closed and stored for future use, identified as ML1) will be reopened and closed.

21  These roads will be "treated to maintain appropriate hydrological function and closed through

22  the timer sale contract after harvesting activities. *Id.* There is no net increase here.

23

REPORT AND RECOMMENDATION - 21

3)      12 miles (of the existing 22 miles) of existing "unspecified," *i.e.*, non-National Forest System roads will be used as temporary roads and will be "hydrologically treated and decommissioned after harvesting activities." AR 20291. There is no net increase here.

4)      15 miles of "former temporary roads," *i.e.*, leftover road prism used in past activities and then abandoned and 5 miles of "new temporary roads," *i.e.*, preexisting roads deemed inadequate, which will be decommissioned following thinning activities. AR 20291. There is no net increase here.

5)      The Project will decommission 16.8 miles of National Forest System road no longer needed for forest management (AR 20270, 20294) and will convert 1.8 miles of open National Forest System road in two recreation areas from roads to trails (AR 20270, 20293-20294, 20295-20301). Thus, there is no net increase in road miles within the Project area but there is a net *decrease* in road miles within the Project area of 18.6 miles.

Plaintiffs incorrectly equate the 27 miles associated with temporary road reconstruction (which actually adds up to 32 miles when taking into account the 5 miles of new temporary road construction) with the 29 miles of stored roads that would be reopened—they are two different categories of roads that will be used to facilitate the thinning activities. *See also* AR 19303 (separately discussing stored roads and temporary roads used for the project). Thus, there is no discrepancy with respect to the total temporary road miles. In reply, Plaintiffs argue that the Forest Service has failed to account for the "5 miles of new temporary road," which "come on top of the Project's proposal to use the supposedly existing 27 miles of unclassified or decommissioned roads – of which only 22 or 23 miles actual exist, depending on whether Table 33 or Table 44 is correct." Dkt. 36, pp. 8-9.

First, as previously noted, Plaintiffs are incorrectly comparing the number of temporary road miles identified in the DN with the figures in Table 33, which displays existing transportation system road miles, and Table 44, which displays maintenance levels of the roads in the Project area. Second, the Forest Service explains that the additional 20 miles of temporary road (15 miles of road prism from previous timber sales that exist on the landscape as temporary roads and 5 miles of new temporary roads which are being used in areas in which preexisting roads were deemed inadequate –all of which will be decommissioned at the end of the Project) are not part of the "existing transportation system" in the Project area and therefore, were correctly not reflected in Table 33.

          d.    <u>Errata</u>

Plaintiffs' also contend that the Errata (AR 20264-20667) introduces new discrepancies. According to the Forest Service, the primary purpose of the Errata as it relates to mileage number is to make minor corrections to the reported maintenance levels on Road 4065 necessitated by a mapping error that was later discovered. The adjustment for this error, made by the Errata, was to reflect a slight increase in ML3 mileage and a corresponding slight decrease in ML 2 mileage. The Errata also adjusted for additional road decommissioning that is a component of Alternative 2B. AR 20266-20667. Both adjustments in road mileages from the Errata are reflected in the road mileage ML changes listed in Table 1 of the DN (AR 20270).

Plaintiffs further claim that there are inconsistencies between the post-project road mileage calculation for Alternative 2B in Table 44 and the Errata. According to Plaintiffs, the Errata indicates a 27-mile reduction of total road mileage (from 197 miles to 170 miles) "without accounting for them anywhere." Dkt. 32, p. 14; *see also* AR 20266-67. The Forest Service responds that this is neither a mistake, an effort to correct past mistakes, nor an unexplained

1   disappearance. Rather, the 27-mile difference in total miles between Table 44 and the total

2   number of miles calculated by Plaintiffs from the Errata is attributable to a Forest System

3   decision to take no action as to roads in the Canyon Creek area that lie beyond a damaged bridge.

4   As Table 44 notes in its title, the road mileage in that table "includes road miles beyond the

5   Canyon Creek Bridge that had no change in maintenance level." AR 19313. A subsequent

6   decision was made to limit Access and Management Status changes in the DN to only those

7   roads within the project area that had been reviewed by the Interdisciplinary Team. The deciding

8   official on the Project directed the team not to pursue surveys beyond the bridge due to the lack

9   of access and lack of staff to accomplish needed surveys over an extensive area on foot. Supp

10  AR 00634- 00639. Therefore, Table 1 (AR 20270) lists the changes in maintenance levels for

11  only road miles which the team reviewed. Consistent with the above, the legend on the project

12  map for Alternative 2B at AR 20318 includes a descriptor box that explains that "Roads beyond

13  Canyon Creek Bridge were not analyzed as part of Access and Travel Management proposed

14  maintenance-levels because of bridge damage and lack of access."

15      The Court finds that the Final EA sufficiently explains "minor changes in road mileage"

16  gained during continuing field reconnaissance. *See, e.g.,* AR 19315 (the total miles of

17  unspecified or decommissioned roads totaled to 23 miles); *see also* Supp. AR 00051-00633

18  (Survey data); AR 1913 ("For example, there was a need for clarification on road numbers . . . .

19  Benson Creek Road (FSR 4005) was previously shown in the Forest Service database from MP 0

20  to MP 1 as a County Road and MP 1 to MP 3.5 as a decommissioned road.").

21          e.      Use of Temporary Roads

22          Plaintiffs also assert that the Forest Service "fail[ed] to include 'temporary' roads

23  in its post-Project inventory – it does not count them at all, as if the temporary roads will never

REPORT AND RECOMMENDATION - 24

1    exist." Dkt. 32, p. 21, ll. 21-22. The Forest Service responds that it accounts for every mile of

2    temporary road that will be used for Project purposes as well as the ultimate disposition of every

3    mile of temporary road that will be used for Project purposes. Every mile of temporary road that

4    is used in connection with this Project will be closed and decommissioned as part of the Project.

5    AR 20291. All temporary roads are decommissioned following thinning activities, meaning there

6    will be no change in total road mileage as a result of the temporary road reconstruction or

7    construction. AR 20291.

8          Plaintiffs contend that the Forest Service cannot satisfy the "no net increase" standard by

9    closing and decommissioning roads because, "[t]he only way to offset the impacts of the 10–20

10   years of new 'temporary' roads and thereby achieve no net increase would be to decommission

11   other roads before or concurrently with opening the new 'temporary' roads." Dkt. 32, p. 24, ll. 1-

12   3. Plaintiffs argue that these roads should not be treated as "temporary" because "nothing in the

13   record provides a deadline by which the timber contracts will have to decommission the

14   temporary roads." Dkt. 32, p. 22.

15         The DN/FONSI states that "[a]s per standard timber sale contract clauses, temporary

16   roads would be decommissioned following use," meaning after harvest activities are completed.

17   AR 20291. According to Plaintiffs, this means that the decommissioning activities could occur

18   10 to 20 years from now and therefore, the roads can hardly be considered "temporary." Dkt. 32,

19   pp. 22-23. Although the timber sale and stewardship contracts, which were awarded after the

20   Final EA, include termination dates that are for a much shorter duration than 10 to 20 years,[4]

21

22   ────────────────────
     [4] *See* Dkt. 16, Price Decl., Ex. C (Bonanza Thin contract terminates on December 31, 2026), *Id.*,
     Price Decl. Ex. D (Mallardy Thin contract terminates on September 30, 2025); Dkt. 17,
23   Torgerson Decl. ¶ 6 (Green Grouse stewardship contract has a three-year operating window);
     *see*, *e.g.*, Price Decl., Ex. B at 17-18 (Dkt. No. 16-2) (providing temporary road closure
     provisions)).

REPORT AND RECOMMENDATION - 25

Plaintiffs argue that the contracts can be extended for even longer terms. Plaintiffs also note that the Project authorizes 20 years of logging roads (*see* AR 19109) ("the purpose of thinning activities … is to enhance habitat conditions for old forest associated species, with an emphasis on nesting habitat for the marbled murrelet and northern spotted owl and to manage the reserve on a landscape scale with opportunities for forest management for the next 10 to 20 years, supplying timber products through those thinning activities.")

Plaintiffs rely on *Native Ecosystems Council v. Krueger*, 946 F.Supp.2d 1060, 1080 (D. Mont. 2013), for the proposition that temporary roads need to be considered and "offset" when determining whether the agency has satisfied the "no net increase" in road mileage requirement. Dkt. 32, p. 24. In that case, the district court held that the Forest Service violated the Endangered Species Act by failing to analyze whether "the temporary increase in road density and the temporary decrease in summer secure areas during the Project's 5 to 10 year duration would affect transitory grizzly bears." 946 F.Supp.2d at 1080. However, the district court also praised the Forest Service for closing temporary roads in the elk habitat during hunting season "so that *there will be no net increase in road density in security areas during the hunting season* over the course of the Project." *Id.* at 1093 (emphasis added). Plaintiffs contend that this statement implies that there would have been a net increase in road density during the Project had the Forest Service not closed those temporary roads during the hunting season and therefore, the Forest Service must offset temporary roads or be considered in violation of the "no net increase" standard. Dkt. 36 at 12.

Here, the record does not reflect a need to close temporary roads during hunting seasons during the life of the Project to avoid violations of the Endangered Species Act. There is also nothing in the text of the relevant standard which dictates that roads used in connection with a

1    project must be decommissioned within a particular period of time. Moreover, courts have

2    upheld projects that have authorized temporary increases in road mileage, even when the Forest

3    Plan has a requirement for "no net increase." *See, e.g., All. for the Wild Rockies v. Bradford*, 856

4    F.3d 1248, 1243 (9th Cir.2017) (holding that it was not arbitrary and capricious for the Forest

5    Service to conclude that roads closed to motorized access by berms or barriers do not count

6    toward "linear miles of total roads" for purposes of the no net increase provision of the Access

7    Amendments when the Forest Plan expressly permits "[t]emporary increases in linear miles of

8    total roads" so long as the roads are "closed immediately upon completion of activities" (internal

9    quotation marks omitted)); *All. for the Wild Rockies v. Pena*, 865 F.3d 1211, 1222 (9th Cir.

10   2017) ("The Forest Service's conclusion was neither arbitrary nor capricious . . . [because] all 30

11   miles would be decommissioned and subject to closure treatments as soon as the project

12   activities end."); *Klamath-Siskiyou Wildlands Ctr. v. Graham*, 899 F.Supp.2d 948, 966 (E.D.

13   Cal. 2012) (holding that the Forest Service complied with its obligation for no net increase of

14   roads in Key Watersheds under the 1994 NWFP because "the Forest Service's addition of 6.7

15   miles of user-created roads in Key Watersheds is sufficiently offset by the agency's undertaking

16   to decommission 15 miles of existing NFTS roads in the near future").

17        As written, the "no net increase" standard disallows a "*net* increase" in the amount of

18   roads. AR 06468. *All. for the Wild Rockies v. U.S. Forest Serv.*, No. CV 07-150-M-DWM, 2008

19   WL 8985475, at *11 (D. Mont. July 30, 2008), *aff'd sub nom. All. For Wild Rockies v. U.S.*

20   *Forest Serv.*, 351 F. App'x 167 (9th Cir. 2009) ("Net" means "free from all charges or

21   deductions.") (citing Merriam–Webster Dictionary, at 350 (1998)).

22        Plaintiffs' construction of the word "net" to require the offsetting of road mileage while

23   the Project is ongoing rather than as a final tally after the Project has been completed is not

REPORT AND RECOMMENDATION - 27

1    supported by either the standard itself or the text of the Northwest Forest Plan. A nearly identical

2    argument was rejected by the Court in *All. for the Wild Rockies*, 2008 WL 8985475 at *11

3    ("Plaintiff's assertion that 'no net increase' prevents the Forest Service from implementing

4    projects that increase total motorized route density at any time during project implementation is

5    wrong."); *see also Klamath-Siskiyou Wildlands Ctr. v. Graham*, 899 F. Supp. 2d 948, 966 (E.D.

6    Cal. 2012) (The Forest Service's "undertaking to decommission 15 miles of existing NFTS roads

7    in the near future" satisfied the no net increase standard.)

8         Nevertheless, Plaintiffs insist that a Project that could take 10–20 years requires a

9    different approach as none of the previous cases dealt with projects of similar length. Here,

10   however, there will be no net increase in the amount of roads within the Project area during the

11   Project and, before completion of the Project all temporary roads will be decommissioned. Thus,

12   there is no need for a different approach regardless of the length of the Project. In addition, the

13   Northwest Forest Plan specifically contemplates that decommissioned roads do not count toward

14   a net increase in roads. *See* AR 06468 (The amount of existing system and nonsystem roads

15   within Key Watersheds should be reduced through decommissioning of roads."). Thus, following

16   their decommissioning, temporary roads that were used in the Project cannot be counted as an

17   "increase" in the amount of roads. Because the Project adds no roads to the Project area, there

18   cannot be a "net increase" in the amount of system or nonsystem roads.

19        Plaintiffs respond that if the Forest Service wants the benefit of this rationale, it must be

20   able to account for its road mileage both pre- and post-Project. As previously discussed, the

21   Forest Service has adequately done so. The 1994 NWFP provides that the no net increase

22   provision means that "for each mile of new road constructed, at least one mile of road should be

23   decommissioned, and priority given to roads that pose the greatest risks to riparian and aquatic

ecosystems." AR 06468 (emphasis added). The Forest Service is in compliance with the 1994

Northwest Forest Plan because the Project does not propose to construct any new roads (relying

instead on open, stored and temporary roads to facilitate harvest activities) and all temporary

roads constructed will be decommissioned before the Project activities are completed, and there

will be a net decrease of approximately 18.6 miles of National Forest mileage in the Project

area.[5]

        While Plaintiffs may interpret the "no net increase" standard in a different manner, this

does not render the Forest Service's interpretation unreasonable. *See Ecology Center*, 574 F.3d at

661 (explaining that, in the face of ambiguity, "we defer to the Forest Service's reasonable

interpretation of the Forest Plan's requirements"); *Native Ecosystems Council*, 697 F.3d at 1056

("[T]he Forest Service's interpretation and implementation of its own forest plan is entitled to

substantial deference.").

        In sum, the Court finds that the Forest Service complied with its obligations under the

1994 NWFP for Key Watersheds to comply with "no net increase" standard and adequately

explained road maintenance level changes pre- and post-project in the Final EA and DN/FONSI.

Therefore, it is recommended that summary judgment on this issue be entered in favor of the

Forest Service.

        2.    Maintenance of Woodpecker Habitat

        The 1990 Plan sets an objective of retaining 40% of the potential population of "cavity

nester" (woodpecker) habitat throughout the forest. Dkt. 7-8, AR 02527–03089 (1990 Plan), at

---

[5] The record also reflects that since 1995, the Forest Service has reduced aquatic risk by
stabilizing many miles of road as well as closing or decommissioning roads no longer needed for
land management. Thus, a 49% overall reduction in the open road system throughout the project
area watershed has already been achieved. AR 19055.

REPORT AND RECOMMENDATION - 29

1    AR 02584. In support of this objective, the 1990 Plan sets Standards and Guidelines for "project

2    planning" that incorporates that objective and increase the standard to 80% in crucial riparian

3    areas:

4         Retain standing dead and standing green trees sufficient to maintain cavity nester
          habitat at or above 40% of minimum potential population levels, throughout the
5         managed forest (80% in riparian areas).

6    Dkt. 7-8, at AR 02691 (1990 Plan).

7         Based on specialist reports, the Forest Service determined that the Project "would not

8    contribute to a negative trend in the viability of these management indicator species on the

9    Forest." AR 18098, 19259. This is so, explains the Forest Service, because the Project is

10   designed not only to retain existing snags, but also to enhance the growth potential of the treated

11   areas so that, in future years, more higher quality habitat in the form of larger diameter snags will

12   be present in the forest landscape in order to enable cavity excavators to reach their full

13   population potential.[6] The Project incorporates numerous design features that have the purpose

14   of retaining as many snags as possible, as well as retaining trees that have the potential to

15   become and/or create additional snags, in order to effect a long term improvement in the quality

16   and quantity of cavity excavator habitat.[7] The design features include: (1) excluding from harvest

17   all trees greater than 20" dbh, AR 20288 (#6); (2) retaining all existing snags and large downed

18   wood, *id*. (#7); not selecting trees for harvest because of damage and favoring for retention trees

19   ─────────────────

20   [6] *See* AR 20286 ("retain pockets of snag habitat created by disease, insects or other natural
     agents); AR 20287 ("residual trees…may include trees…that contribute to structural complexity
21   and diversity within the stand and have potential to develop future snags, nesting cavities and
     nesting platforms.")

22   [7] "The reduced snag densities in the proposed thinned areas are overshadowed by the amount of
     old forest snag contributions on the landscape that would maintain snag levels at the 80 percent
23   tolerance level for species associated with snags greater than 10" dbh and with snags greater than
     20" dbh for both Western Lowland Conifer Hardwood Forest (WLCH) and the Montane Mixed
     Conifer Forests (MMC) vegetation types." AR 18097.

REPORT AND RECOMMENDATION - 30

1   that have the potential to become or creates snags because of evident root disease, *id*. (#8);

2   special protection for "legacy snags," including, as necessary, a "no cut buffer" around existing

3   snags, AR 20289 (#13). Additionally, all snags will be retained unless they pose an unavoidable

4   danger to human safety. *Id*.

5       The Final EA explained that "Alternative 2 is designed to maintain the snag numbers at

6   and above the 40 percent population level and meet the 30 percent to 50 percent tolerance level

7   of snag densities for west-side cavity associated species as per the DecAID review."[8] AR 19258.

8       The DecAID analysis explains that "tolerance level" "is the percentage of individual

9   birds within a given population that will nest in forest stands characterized by a certain number

10  and size range of snags. For example, black-backed woodpeckers show 30 and 50 percent

11  tolerance levels for stands that contain 62 and 88 snags >10 inches dbh per acre, respectively.

12  This means that 20 percent (50 minus 30) of all the black-backed woodpecker nests in that area

13  were found in stands with snag densities in that range (tolerance interval)." AR 17942.

14      Plaintiffs argue that, in reporting that "[the] modeled expected snags/ acre *would not*

15  *provide adequate numbers to support above 40 percent of the target primary excavator* in the

16  projected 100 years," the Forest Service has "admitted" that the Project will not meet this

17  standard" (Dkt. 32, p. 26, ll. 1-7 (emphasis added)) as the record reflects that "the cavity

18  excavator population" will fall to "just 30%" in "the lowlands" and "less than 30% in the

19  Montane Region." *Id.*, p. 26. Tables 24 and 25 provide the modeled snag densities for

20  Alternative 2 for western lowland/conifer hardwood forests and montane mixed conifer forests.

21  AR 19258. Plaintiffs' argument that 40 percent minimum population levels were not met rests on

22

23  ───────────────

[8] DecAID is "the decayed wood advisor for managing snags, partially dead trees, and down wood for biodiversity and is a "computer-based summary of current knowledge and available data on snags and deadwood in the Pacific Northwest ecosystems . . . ." AR 19255.

REPORT AND RECOMMENDATION - 31

its attempt to equate "tolerance levels" as used in DecAID with "population levels," which are

not the same. *Compare* Dkt. 32, pp. 25-26, with AR 17942-42 (defining "tolerance level" used

for wildlife and vegetation inventory data). Plaintiffs argue that the Forest Service does just that

because it uses the DecAID habitat models to estimate woodpecker population. Dkt. 36, p. 15.

However, the Final EA goes on to explain that "[t]his modeling does not appear to

capture the recruitment of snags from the known damage agents described in the silviculture

report for the project area of root rot, beetle kill, reoccurring looper infestations, and bear

damage, or weather related impacts from drought, wind and winter storms." AR 19258. The EA,

in the same section, states that with respect to the impact of the Project:

> Alternative 2 is designed to maintain snag numbers at and above the 40 percent
> population level and meet the 30 percent to 50 percent tolerance level of snag
> densities for west-side cavity associated species as per the DecAID review.
> Desired snag levels are managed at both the project level and the 6th field
> watershed level with special emphasis on large diameter snag retention and
> creation due to the lack of this cohort in the second-growth stands.

AR 19258. Elaboration on this conclusion continues at AR 19259, leading to the ultimate

conclusion that "Alternative 2 would not contribute to a negative trend in the viability of snag

associated management indicator species on the Forest." In addition, the Final EA explains that

the population levels within 6th field watershed would be maintained:

> Due to the limited treatments in Alternative 2 (combined non-commercial and
> commercial thinning) proposed within the project area there would be less than
> 10-12 percent of the project area with the modeled levels of reduced snag
> densities. The 2500 to 3600 acres proposed for commercial thinning in
> Alternative 2 represent less than 6 percent of the approximately 65,000 acre
> project area and is less than one percent of the approximately 116,000 acres in
> South Fork Stillaguamish drainage. *The reduced snag densities in the proposed
> thinned areas are overshadowed by the amount of old forest snag contributions
> on the landscape that would maintain snag levels at the 80 percent tolerance level
> for species associated with snags greater than 10" dbh and with snags greater
> than 20" dbh* for both the Western Lowland Conifer Hardwood Forest (WLCH)
> and the Montane Mixed Conifer Forests (MMC) vegetation types.

AR 19259 (emphasis added); *see also* AR 19256 (noting "on a landscape scale, Alternative 2 would contribute to snag densities that are expected to meet snag levels at 50 to 80 percent tolerance levels for wildlife species).

Plaintiffs also contend that the Project violates the Forest Plan guideline to maintain at or above 80% of minimum potential population levels, throughout the managed forest in riparian areas. Dkt. 32, p. 26, l. 23 – p. 27, l.7. Plaintiffs provide no evidence to support this allegation.

The Forest Service notes that these standards apply to the Forest at large and not the Project area. The proposed treated areas represent less than 6 percent of the Project area, and less than 1 percent of the federal lands in the watershed. Therefore, the Project treated acres would not substantially change the snag numbers on a landscape scale that include a large portion of the landscape in reference conditions of unharvested forest. AR 17965. The snag retention and protection built-in to the Project design previously mentioned will also apply to riparian areas. In addition, the record reflects that the Project provides heightened protection to riparian areas, that will inure to the benefit of cavity excavators and other wildlife, including a series of specified "no-cut buffers." *See*, *e.g.,* AR 20304-20305 (SWF1, SWF2, SWF3, SWF4, SWF5, SWF6).

Based on the foregoing, the undersigned concludes that the Forest Service's determination (supported by specialist reports in the record) that the Project "would not contribute to a negative trend in the viability of" the Pileated Woodpecker and primary cavity excavators, was not arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law. Accordingly, it is recommended that summary judgment on this issue be entered in favor of the Forest Service.

3.      <u>Sensitive Species Evaluations</u>

In compliance with 1990 Forest Plan requirements, and as noted in the DN:

> Biological Evaluations were prepared (specialists reports in the Project Record)
> and the project is properly designed and mitigated to maintain viable populations
> of Sensitive plant, fish and wildlife species, and does not contribute to or trend
> these species toward being listed as Threatened or Endangered.

AR 20280.

Plaintiffs argue that this finding is not supported by the record. Dkt. 32, p. 28, ll. 8-14. Plaintiffs also argue that the biological evaluation does not describe the species' abundance in the Project area or the species' sensitivity to logging and road building and without this data, the evaluation does not actually evaluate anything. Dkt. 36, p. 16. Plaintiffs contend that because there is "no data" regarding the abundance of sensitive species (*e.g.*, Cascade red fox, northern goshawk, California wolverine, harlequin duck, common loon, Townsend's big-eared batt, little brown myotis, mountain goat, and peregrine falcon) or information about the sensitivity of those species to project activities, there is no rational basis for the Forest Service's ultimate conclusions. Dkt. 32, p. 28.

However, the record contains a specialist report assessing the Project's impact on all "sensitive species," *i.e.*, plant and animal species identified by the Regional Forester for which population viability is a concern. *See* AR 18069-18073, 18088-18092. The specialist report describes the environmental effects of all sensitive species, *i.e.*, Cascade red fox (AR 18090-18091), northern goshawk (AR 18070-18071), California wolverine (AR 18091), harlequin duck (AR 18070), and peregrine falcon (AR 18079), and concludes for the reasons stated as to each that the Project will not contribute to or trend these species toward being listed as Threatened or Endangered. For example, in the case of the peregrine falcon, the wildlife biologist concluded that there would be no impact because the suitable habitat that is present near the Project area

REPORT AND RECOMMENDATION - 34

1    would not be affected, directly or indirectly, by implementation of the Project. AR 18079; *and*

2    *see* AR 14039 ("Activities on the MBSNF are not expected to impact potential nest sites or

3    contribute to a decline in foraging habitat.")

4          The wildlife biologist who prepared the specialist report states that "[t]he analysis

5    focused on the existing major vegetation types, a review of species ecology literature, historical

6    wildlife data on file, watershed analyses, review of Climate Change Vulnerability and

7    Adaptation in the North Cascades Region . . ., and personal knowledge of the project area." AR

8    18058. The analysis relies on information from a variety of sources, including site visits for

9    Project planning, existing databases and inventories, consultations with other resource

10    professionals, relevant sources of scientific literature, and personal knowledge of resources based

11    on field visits and experience. AR 18059. The wildlife biologist identifies as potential direct

12    impacts, among other things "vegetation treatments and timber harvest," and associated ground

13    disturbance including road construction and maintenance, AR 18078, and the effects of those on

14    "terrestrial wildlife habitat." AR 18079-18081. The specialist report then discusses how these

15    effects will affect each of the sensitive species. AR 18088-18092.

16          As noted by the Ninth Circuit, courts "defer to the Forest Service as to what evidence is,

17    or is not, necessary to support wildlife viability analyses." *The Lands Council v. McNair*, 537

18    F.3d 981, 992 (9th Cir. 2008) (en banc), *overruled in part on other grounds by Winter v. Nat.*

19    *Res. Def. Council, Inc.*, 555 U.S. 7 (2008). This is because the "proper role" of the Court "is

20    simply to ensure that the Forest Service made no 'clear error of judgment' that would render its

21    action "arbitrary and capricious.'" *Id*. at 993 (internal citation omitted). To do so, the Court

22    "look[s] to the evidence the Forest Service has provided to support its conclusions, along with

23    other materials in the record, to ensure that the Service has not, for instance, 'relied on factors

1   which Congress has not intended it to consider, entirely failed to consider an important aspect of

2   the problem, offered an explanation for its decision that runs counter to the evidence before the

3   agency, or [an explanation that] is so implausible that it could not be ascribed to a difference in

4   view or the product of agency expertise.'" *Id*. (internal citations omitted). And the Court

5   "conduct[s] a 'particularly deferential review' of an 'agency's predictive judgments about areas

6   that are within the agency's field of discretion and expertise . . . as long as they are reasonable.'"

7   *Id*. (internal citations omitted).

8         Here, the evidence reflects that the Forest Service's reliance on the specialist report is not

9   arbitrary and capricious. Because Plaintiffs have failed to show that the Forest Service made a

10  clear error in determining what evidence is, or is not, necessary to support its wildlife viability

11  analyses, it is recommended that summary judgment on this claim be entered in favor of the

12  Forest Service.

13        4.    Puget Oregonian Snail

14        Plaintiffs contend that the Forest Service acted arbitrarily and capriciously in failing to

15  conduct a pre-disturbance survey of the Project area for the presence of the Puget Oregonian

16  snail (Cryptomastic devia) because the record does reveal the suspected presence of the Puget

17  Oregonian snail, and there are "hundreds of acres" of big-leaf maple (the snails' preferred

18  habitat), in the Project area. Dkt. 32, pp. 22-24; Dkt. 36, p. 17.

19        The Forest Service first notes that the diagram upon which Plaintiffs rely for the

20  proposition that there are "hundreds of acres of big-leaf maple in the Project area," does not

21  depict acreage and that it is not possible to determine acreage from this diagram. Instead, the

22  diagram provides a relative comparison of different tree species by percentage (of which the

23  Bigleaf maple represents approximately 1% of the current species composition of trees in the

1    Project area).

2    Additionally, an October 11, 2006 Order issued in *Northwest Ecosystem Alliance, et al. v.*

3    *Mark E. Ray, et al.*, Case No. C04-844P, W.D. Wash., a case in which the Forest Service was

4    ordered to abide by the survey and management requirements established in the 2001 Record of

5    Decision and Standards and Guidelines for Amendments to the Survey and Manage, Protection

6    Buffer, and other Mitigation Measures Standards and Guidelines, the Court specifically

7    exempted the Forest Service from that obligation in the case of "[t]hinning in forest stands

8    younger than 80 years of age . . ." *Id.* at Dkt. 109, p. 2, ll. 18-21. Assuming the Project area may

9    encompass suitable habitat for the Puget Oregonian snail, the Project involves only

10   thinning in forest stands younger than 80 years of age, and therefore, under prior order of this

11   Court, the Forest Service was exempt from any obligation to survey for the Puget Oregonian

12   snail.

13   More importantly, even if the survey and management requirements were to apply, there

14   is a statement in the record of a Forest Service Wildlife Biologist that "[d]espite years of survey

15   on the MBS since 1997, in apparently suitable habitat, the species has not been found." AR

16   18076. Additionally, the Wildlife Biologist's report noted that "due to the lack of old-growth

17   features and the mollusk's obligate association with Bigleaf Maple (Qurecus macrophylum)

18   habitats surveys were deemed unnecessary for this species." AR 18059.

19   Because there is support in the record for the Forest's Service's decision, the decision is

20   not arbitrary and capricious. The knowledge and judgment of the Forest Service's Wildlife

21   Biologist rests upon, among other things, lack of habitat suitability for the species and the fact

22   that previous surveys going back to 1997 failed to turn up any evidence of the presence of the

23   mollusk in otherwise suitable habitat within the Forest. As previously noted, the Forest Service

1    "must have discretion to rely on the reasonable opinions of its own qualified experts . . ." *Animal*

2    *Legal Def. Fund v. United States Dep't of Agric.*, 223 F. Supp. 3d 1008, 1021 (C.D. Cal. 2016)

3    (quoting *Marsh v. Oregon Nat. Res. Council*, 490 U.S. 360, 378 (1989)).

4        Plaintiffs have failed to show that the Forest Service made a clear error in judgment in

5    deciding that a pre-disturbance survey for the presence of the Puget Oregonian snail in the

6    Project area was unnecessary. Accordingly, it is recommended that summary judgment on this

7    issue be entered in favor of the Forest Service.

8    **B.    NEPA**

9        1.    Hard Look at Environmental Impacts to Wildlife Species

10       Plaintiffs allege that the Forest Service has not undertaken a thorough environmental

11   analysis of the SF Stillaguamish Project, because the agency "has failed to determine the

12   baseline wildlife populations prior to the Project." Dkt. 32, p. 31, ll. 1-3. Without this baseline,

13   Plaintiffs contend that the Forest Service has no idea of the diversity of species or size of

14   populations present and thus, cannot conclude that the Project will have no significant impact.

15   Dkt. 36, p. 14.

16       NEPA requires an agency to take a "hard look" at the potential environmental

17   consequences of its contemplated actions before making a final decision to proceed. *Robertson*,

18   490 U.S. at 350-51. The Ninth Circuit has interpreted a "hard look" to mean "a reasonably

19   thorough discussion of the significant aspects of the probable environmental consequences." *Ctr.*

20   *for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*, 538 F.3d 1172, 1194 (9th Cir.

21   2008). Specifically, NEPA requires no more than the agency "succinctly describe" the affected

22   environment. 40 C.F.R. § 1502.15. "The descriptions shall be no longer than is necessary to

23   understand the effects of the alternatives." *Id*. This means only that an agency has a duty "to

REPORT AND RECOMMENDATION - 38

1    assess, in some reasonable way, the actual baseline conditions at the [project] site." *Oregon Nat.*

2    *Desert Ass'n v. Jewell*, 840 F.3d 562, 569 (9th Cir. 2016).

3          It is well-established that the Forest Service can meet its obligations to establish a

4    Project's impacts on wildlife through habitat viability analyses. *Inland Empire Pub. Lands*

5    *Council v. U.S. Forest Serv.*, 88 F.3d 754, 760 (9th Cir. 1996); *and see The Lands Council*, 537

6    F.3d at 996. Thus, on a species-by-species basis, the EA details how species habitat viability will

7    not be negatively impacted by the Project. AR 19237-19265. Other documents in the record also

8    support this conclusion. *See*, *e.g.*, AR 19682-20180 (Biological Opinion). For example, the

9    Biological Opinion regarding the Designated Critical Habitat (DCH) for the northern spotted owl

10   concludes:

11           The proposed action will have insignificant effects to spotted owl DCH. Spotted
             owl dispersal habitat would be maintained in the short-term while the thinning
12           prescriptions would accelerate the development of spotted owl nesting, roosting,
             and foraging habitats in the long-term. Therefore, we concur with MBSNF's
13           determination that the proposed action is not likely to adversely affected spotted
             owl DCH.
14
15   AR 19880. Impacts aside from habitat loss, including disturbances to wildlife, are also

16   considered, and thoroughly discussed.

17          Plaintiffs provide no authority for the proposition that the Forest Service was obligated to

18   determine pre-project wildlife populations. In addition, the "court defers to agency expertise on

19   questions of methodology unless the agency has completely failed to address some factor,

20   consideration of which was essential to a truly informed decision whether or not to prepare an

21   [EIS]." *N. Cascades Conservation Council v. U.S. Forest Serv.*, 98 F.Supp.2d 1193, 1202 (W.D.

22   Wash. 1999)).

23          As previously noted, the Forest Service thoroughly analyzed the impacts to wildlife in its

     Final EA and Wildlife Report. AR 19237-62 (Final EA); AR 18051-109 (Wildlife Report); *see*

REPORT AND RECOMMENDATION - 39

1    *also* AR 19862-20180 (Biological Opinion). Because NEPA requires nothing more (*see*, *e.g.*,

2    *McNair*, 537 F.3d at 1003), the undersigned recommends that summary judgment on this issue

3    be entered in favor of the Forest Service.

4            2.        Reasonable Range of Alternatives

5            NEPA requires federal agencies to "study, develop, and describe appropriate alternatives

6    to recommended courses of action in any proposal which involves unresolved conflicts

7    concerning alternative uses of available resources[.]" 42 U.S.C. § 4332(2)(E). Although this

8    obligation applies to both the preparation of an EA and EIS, *Bob Marshall Alliance v. Hodel*,

9    852 F.2d 1223, 1229 (9th Cir. 1988), "an agency's obligation to consider alternatives under an

10   EA is a lesser one than under an EIS." *Ctr. for Biological Diversity v. Salazar*, 695 F.3d 893, 915

11   (9th Cir. 2012) (internal quotation marks omitted). "[W]hereas with an EIS, an agency is

12   required to '[r]igorously explore and objectively evaluate all reasonable alternatives,' *see* 40

13   C.F.R. § 1502.14(a), with an EA, an agency only is required to include a brief discussion of

14   reasonable alternatives." *Salazar*, 695 F.3d at 915 (quoting *N. Idaho Cmty. Action Network v.*

15   *U.S. Dep't of Transp.*, 545 F.3d 1147, 1153 (9th Cir. 2008)) (brackets in original); *cf.* 40 C.F.R. §

16   1508.9(b). When evaluating a reasonable range of alternatives, an EA "need not consider an

17   infinite range of alternatives, only reasonable or feasible ones." *Westlands Water Dist.*, 376 F.3d

18   at 868 (internal quotation marks omitted).

19           Plaintiffs allege that the Forest Service did not analyze a reasonable range of alternatives

20   *in addition* to Alternatives 2, 2A, 2B, and a "no action" alternative. However, NEPA does not

21   require a specific number of alternatives to be evaluated, and for projects applying an EA, courts

22   have often upheld the Forest Service's analysis of only two alternatives—proposed action and

23   no-action alternatives. *See*, *e.g.*, *Native Ecosystems Council v. U.S. Forest Serv.*, 428 F.3d 1233,

1246 (9th Cir. 2005) ("The statutory and regulatory requirements that an agency must consider 'appropriate' and 'reasonable' alternatives does not dictate the minimum number of alternatives that an agency must consider."); *Bark v. United States Forest Serv.*, 393 F.Supp.3d 1043, 1060 (D. Or. 2019), *rev'd on other grounds*, 958 F.3d 865 (9th Cir. 2020) ("There is no numerical floor on alternatives to be considered, and it is usually sufficient to consider only the preferred and no action alternatives" in an EA) (internal quotation marks omitted); *cf.* 16 U.S.C. § 6514(c)(1) (authorizing action/no-action analysis for projects under the Healthy Forests Restoration Act).

Further, an alternative is considered reasonable only if it meets the purpose and need for the project. *Nat'l Parks & Conservation Ass'n v. Bureau of Land Mgmt.*, 606 F.3d 1058, 1072 (9th Cir. 2010). Courts evaluate an agency's statement of purpose under a "reasonableness standard" and "must consider the statutory context of the federal action at issue." *HonoluluTraffic.com v. Fed. Transit Admin.*, 742 F.3d 1222, 1230 (9th Cir. 2014).

Here, the purpose and need for the Project is to enhance old-growth habitat in LSRs, maintain and restore riparian vegetation composition in Riparian Reserves, contribute a supply of timber products to the public from the forest stand thinning, and manage the forest road system to meet tribal and visitor use. AR 19108-09. The record reflects that the Forest Service considered, but did not analyze in detail, several additional alternatives. AR 19163-65.

Plaintiffs argue that NEPA required the Forest Service to consider an alternative whereby it would engage in strictly non-commercial thinning and thereby, supposedly, avoid the need to "build new environmentally destructive roads." Dkt. 32, p. 31, ll. 13-16. At the outset, the Court notes that Plaintiffs bear the burden to show that their preferred alternative is somehow feasible. *City of Sausalito v. O'Neill*, 386 F.3d 1186, 1208 (9th Cir. 2004); *Morongo Band of Mission*

1    *Indians v. F.A.A.*, 161 F.3d 569, 576 (9th Cir. 1998). Merely asserting that building roads is

2    "environmentally destructive" will not satisfy this burden. Plaintiffs must demonstrate on the

3    record that the Forest Service's conclusion of no significant environmental impact is arbitrary

4    and capricious in the context of the design of this Project. Plaintiffs have not done so.

5          Plaintiffs assume that the beneficial goals of the Project can be fully achieved by

6    applying thinning treatments only in areas where the timber is unmerchantable and therefore

7    there is no need to utilize roads to remove felled timber from the landscape. However, nothing in

8    the record supports this assumption. Instead, the second growth timber stands that the Forest

9    Service identified as potentially benefitting from thinning treatment include both "younger

10   stands (primarily 20 to 29 years of age)" and "older stands (typically 45 to 80)" that contain

11   merchantable timber. AR 19101. (Forest stands greater than 80 years of age would not be treated,

12   and trees greater than 20 inches in diameter at breast height (DBH) would not be cut or

13   commercially harvested. AR 19101, 19125.)

14         More importantly, one of the Project purposes is to "produce merchantable timber as a

15   product of necessary and desirable restoration actions." AR 19109. The EA documents that

16   thinning treatments in those stands accompanied by the removal of merchantable timber can be

17   accomplished without significant environmental impacts.

18         Plaintiffs insist, however, that the Forest Service was nevertheless obligated to consider a

19   more "environmentally friendly" alternative even though the Forest Service has determined that

20   its chosen alternative would not result in significant environmental impacts and even though

21   Plaintiffs' proposed alternative would not fulfill the Project purposes because it would require

22   the Forest Service to forego its goal of improving wildlife habitat in forest stands that contain

23

REPORT AND RECOMMENDATION - 42

1   merchantable timber.[9]

2          It is, however, improper for this Court to redefine for the Forest Service what its project

3   purpose should be. *See Ford v. Train*, 364 F. Supp. 227, 233 (W.D. Wis. 1973) ("This court

4   should not substitute its judgment about the basic need for this project for the judgment of said

5   agencies."). Here, the Forest Service, in the exercise of its discretion, has properly determined

6   that it is an appropriate purpose for the agency to improve habitat in forest stands in the Project

7   area, including those that contain merchantable timber. NEPA does not require the Forest

8   Service to scale back its project in favor of an arguably more environmentally-friendly

9   alternative that plaintiffs would prefer. *Nat'l Audubon Soc'y v. Dep't of Navy*, 422 F.3d 174, 184

10  (4th Cir. 2005) ("NEPA is a procedural statute; it does not force an agency to reach substantive,

11  environment-friendly outcomes.") Even in the case of an EIS, federal agencies are not required

12  by NEPA to consider alternatives which will not fulfill the purpose and need for the project as

13  defined by the agency. *City of Angoon v. Hodel*, 803 F.2d 1016, 1021 (9th Cir. 1986)

14  (Acceptance of the Corps' statement of purpose makes consideration of the exchange alternative

15  irrelevant. When the purpose is to accomplish one thing, it makes no sense to consider the

16  alternative ways by which another thing might be achieved.); *and see Laguna Greenbelt, Inc. v.*

17  *U.S. Dep't of Transp.*, 42 F.3d 517, 524 (9th Cir. 1994) ("The range of alternatives that must be

18  considered in the EIS need not extend beyond those reasonably related to the purposes of the

19  project.").

20

21  _____

22  [9] The Forest Service note that Plaintiffs may be suggesting that while the Forest Service could apply thinning treatments in stands containing merchantable timber, it should simply leave the merchantable timber on the ground. Not only would that cause unconscionable waste, but the budgetary shortfall caused by the inability to realize revenue from the commercial sale of the merchantable timber would necessarily prevent the Project from fully realizing its full potential. AR 19123.

23

REPORT AND RECOMMENDATION - 43

Under these authorities, an alternative that would frustrate the purpose of the Forest Service to reach all stands in the Project area in need of treatment, or which would limit the scope of the Project by requiring the Forest Service to forego revenue from merchantable timber, is irrelevant and does not require consideration.

Moreover, once the Forest Service has taken a hard look at the environmental impacts of its proposed action, compared those to a "no action" alternative, and concluded that the Project as contemplated results in no significant environmental impacts, NEPA does not require any further examination of alternatives. *N. Idaho Comty. Action Network*, *supra*, 545 F.3d 1153-1154. Having evaluated a reasonable range of alternatives in the EA, marked on one end by a no-action alternative and the preferred alternative on the other, and no significant impacts having been found, nor any substantial questions raised by Plaintiffs, it is clear from the case law that the statutory and regulatory duty to discuss alternatives for the Project was met. *Native Ecosystems Council*, *supra*, 428 F.3d at 1249; *and see, Earth Island*, *supra*, 697 F.3d at 1023 (internal quotation omitted) ("[I]t makes little sense to fault an agency for failing to consider more environmentally sound alternatives to a project which it has properly determined, through its decision not to file an impact statement, will have no significant environmental effects anyway.")

The undersigned concludes that the Forest Service adequately considered a reasonable range of alternatives and recommends that summary judgment on this issue be entered in favor of the Forest Service.

## CONCLUSION

Based on the foregoing, the undersigned recommends that Plaintiffs' motion for summary judgment (Dkt. 32) be **denied** and summary judgment in favor of the Forest Service be **granted**.

REPORT AND RECOMMENDATION - 44

1

**OBJECTIONS AND APPEAL**

2

This Report and Recommendation is not an appealable order. Therefore, a notice of

3

appeal seeking review in the Court of Appeals for the Ninth Circuit should not be filed until the

4

assigned District Judge enters a judgment in the case.

5

Objections, however, may be filed and served upon all parties no later than **June 17,**

6

**2021.** The Clerk should note the matter for **June 21, 2021**, as ready for the District Judge's

7

consideration if no objection is filed. If objections are filed, any response is due within 14 days

8

after being served with the objections. A party filing an objection must note the matter for the

9

Court's consideration 14 days from the date the objection is filed and served. The matter will

10

then be ready for the Court's consideration on the date the response is due. Objections and

11

responses shall not exceed six (6) pages. The failure to timely object may affect the right to

12

appeal.

13

DATED this 28th day of May, 2021.

14

15

BRIAN A. TSUCHIDA
United States Magistrate Judge

16

17

18

19

20

21

22

23

REPORT AND RECOMMENDATION - 45